THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL RAY LEAMONS, Defendant-Appellant.

Fourth District   No. 4—83—0828

Opinion filed October 3, 1984.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Rebecca L. White, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE MILLS delivered the opinion of the court:

Aggravated indecent liberties with a child.

Oral intercourse with an eight-year-old boy.

Sentence: eight years' imprisonment.

On appeal, defendant argues variously that:

(1) the trial court erred in refusing to suppress a statement he made to the police;

(2) the trial court erred in refusing to order a psychiatric examination of the complaining witness;

(3) the trial court erred in the manner in which *voir dire* was conducted;

(4) the trial court erred in two evidentiary rulings which require reversal;

(5) he was not proved guilty beyond a reasonable doubt;

(6) prosecutorial misconduct in cross-examination of the defendant and in closing argument requires a new trial; and

(7) the sentence of eight years was excessive.

We affirm *in toto*.

## I. THE FACTS

Since Leamons has raised reasonable doubt as an issue which he feels requires reversal, an extensive recitation of the prolix facts is necessary.

The scene of the crime was a trailer park in Springfield. The victim (J.L.) lived in one of the trailers with his mother and two brothers. His grandmother lived in another trailer, as did two of his uncles. Leamons lived in yet another trailer in the court. All of the parties were acquainted with each other through previous interaction at the trailer court.

On March 28, 1983, the victim's mother and his two brothers drove one of his uncles to work in Springfield. The group left around 7:20 p.m. after first dropping the victim off at a neighbor's house. Upon their return, the three went to their grandmother's house, where the victim's mother helped out with some housework. One of her sons left around 9 p.m. and returned shortly thereafter. The three

then left in search of J.L. They drove to Leamons' trailer, where the mother honked the car horn. Getting no response, she exited the car and pounded on the side of the trailer. Again, no response was forthcoming. The trio then went to their trailer. After they arrived at the trailer, both sons left in search of their brother around 10 p.m. J.L. returned home shortly after his brothers left. He took off his coat, at which time his mother noticed a bruise on the side of his neck. She also noted that his lips were swollen, his chin red, and that "little bumps [were] coming off of his mouth."

When she asked him where he had been, he replied that he had been in several neighbors' trailers. Suspecting that something was amiss, she threatened to call the police if he did not tell her what had happened to him. She went to another room, ostensibly to call the police, at which time the victim came in and told her that Leamons had committed a sexual assault upon him. At this point the victim's mother called the police.

Officers Robert Palmer and Ralph Caldwell met Officer Greg Shaffer at the victim's trailer at approximately 10:30 p.m. Shaffer was the first on the scene and was generally in charge of the investigation which followed. After relating the details of the attack to the police, the victim's mother led them to Leamons' trailer and then returned to hers. Upon their approach, the interior lights were on, but as they neared the trailer they were turned off. The officers knocked on Leamons' trailer door and saw someone briefly look out a window. The officers yelled out that they were the police and wanted to talk to the person inside. Leamons eventually came to the door. Upon questioning, he told the police his name and admitted knowing the victim. The police asked him if the victim had been at his trailer earlier in the evening, to which he answered yes. At this point, Leamons was placed under arrest and given his *Miranda* warnings.

Prior to the trial in this cause, Leamons moved to suppress his statements given prior to *Miranda* warnings but the motion was denied. During the hearing on his motion, Leamons testified that he was handcuffed immediately upon his telling the officers his name. He further testified that at no time did he say that the victim had been at his trailer and that he at no time felt that he was free to break off the questioning once he had exited his premises. The testimony of the police officers was as related above. However, Officer Shaffer testified that he did not think the officers were going to let Leamons go, although he was not exactly sure what they were going to do upon their first confrontation. Similarly, Officer Palmer testified that if Leamons had tried to run he would have been apprehended, because

he was a suspect in an ongoing criminal investigation.

The trial of the cause was had on October 25, 1983. The People's case consisted basically of the facts as we have set forth, plus scientific evidence which confirmed the fact that the victim had indeed engaged in an act of oral intercourse. Further, the scientific evidence indicated that Leamons could not be excluded from the population of possible attackers.

Of additional importance to this appeal are these two matters. During the trial, one of the victim's brothers testified that he had gone back to Leamons' trailer after he, his brother, and mother had returned home from their grandmother's house. Upon his approach to Leamons' trailer, he knocked on a rear window but got no response. He testified that he could hear his brother and Leamons inside. He heard Leamons ask, "Does it hurt?" He then returned to his mother's trailer, at which time they went to Leamons' trailer, where his mother stopped, honked the horn, and knocked on the trailer. The victim corroborated his brother by testifying that during the attack Leamons continually asked him if it hurt until he finally said yes. He also testified that Leamons had threatened to kill him if he ever told anyone about the attack. He further testified that during the attack he heard a car horn honking outside and someone pounding on the side of the trailer.

During cross-examination of the victim and his mother, it was established that Leamons had previously ordered the victim to stay away from his trailer due to the fact that the victim was generally troublesome and often fought with other children in the neighborhood.

Leamons' case-in-chief consisted of the character testimony of four witnesses, his own recounting of the events of the evening, and testimony by investigators of the public defender's office to the effect that the victim's mother had given them statements which were inconsistent with her testimony at trial.

Leamons testified that on the date of the occurrence he was employed as a mechanic at Ed's Garage in Springfield. During the course of the day, one of the customers of the garage asked him to help set up a trailer at 2021 Clearlake Avenue in Springfield. Leamons did so, the two completing their efforts sometime after 6 p.m. They went to the Hitch'n Post Lounge, arriving around 6:20 and leaving around 7 p.m. They went to Wanda's Corner, another tavern, where they stayed approximately 20 minutes. They left Wanda's Corner and went to Ed Nutaut's house and stayed until 8:20 p.m. At this time Leamons was driven to his trailer and dropped off.

Leamons testified that he had just gotten to bed when the police

arrived and knocked on his door. He went to the door and was asked if he was Michael Leamons, to which he replied, "Yes." One of the officers told him to step outside and then told Leamons that he was being charged of the sex offense. One of the other officers handcuffed him and led him to a police car. Leamons denied telling the police officers that the victim had been in his trailer that evening. He also denied ever having sexually abused or threatened the victim. Leamons reiterated that the victim had previously been ordered to stay away from his trailer because he was a troublemaker.

On cross-examination Leamons was asked on several occasions whether the police and the complaining witnesses were lying. He replied that in his opinion they were. During closing arguments, the prosecuting attorney made repeated references to the fact that Leamons had called various State's witnesses liars throughout the trial.

A jury found defendant guilty of aggravated indecent liberties with a child. The trial court sentenced Leamons to eight years' imprisonment based upon the enormity of the crime and the devastating psychological impact of the crime on the victim. This appeal followed.

We turn now to the various matters raised by Leamons upon which he relies in urging us to reverse his conviction or reduce his sentence.

## II. Pretrial Motions

### A

■ Leamons argues that the trial court erred in not suppressing the statement given to the police before his arrest, relating that the victim had been at his trailer on the evening of the attack. The statement was given prior to *Miranda* warnings. In Leamons' view, the statement was a result of custodial interrogations, required *Miranda* warnings, and absent the warnings should have been suppressed. His main point is that the officer in charge of the investigation testified at the hearing on the motion to suppress that Leamons was suspected of a crime at the time of his questioning and the officer would not have let him free if he had tried to leave.

In our view the particular mind-set of a police officer is not dispositive of the issue whether a criminal suspect is undergoing custodial interrogation at the time he gives an incriminating statement. In fact, no single circumstance controls. As stated in *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230:

"Custodial interrogation, which the *Miranda* decision governs,

means 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citations.] In determining whether a statement was made in a custodial setting, the court must look to *all* of the circumstances surrounding the questioning, *with no single factor deemed controlling,* and then objectively evaluate whether a reasonable, innocent person would have believed he was free to leave or was expressly or impliedly bound to remain in the presence of police. [Citations.]

Numerous factors are to be considered in this inquiry: the location [citation], time [citation], length [citation], mood and mode [citation] of the interrogation; the number of police officers present [citations] and the presence or absence of friends or family of the accused [citation]; any indicia of formal arrest of the subject including physical restraint, show of weapons or force, booking, fingerprinting or informing the person he is under arrest [citation]; the manner in which the person questioned got to the place of interrogation, *i.e.,* voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion [citation]; whether he voluntarily assists police in their investigation [citation]; whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police [citation]; and the age, intelligence and mental makeup of the accused [citation]." (Emphasis added.)

Applying this test to the facts here first requires us to determine what the facts really were, since the testimony was widely divergent. According to the police officers, they approached Leamons' trailer after being told by the victim's mother that he had sexually attacked her son. As they approached, they noticed that the interior lights of the trailer were on, but the lights were soon extinguished after they announced themselves. They noticed someone look out a window, but no one answered their original call. Leamons eventually emerged and told police his name, that he knew the victim, and that the victim had been at his trailer earlier in the evening. At this point, according to the police, he was arrested.

According to Leamons, the police knocked on his trailer and immediately upon his emerging accused him of the attack, handcuffed him and took him to the police station. In Leamons' version, he at no time told police that the victim had been at his trailer earlier in the evening.

■ Two questions confront us. What the facts were and whether—under the facts accepted—a custodial interrogation took

place. The trial court was free to believe or disbelieve either version of the facts. Based on its ruling, it is apparent that the trial court chose to accept the police officers' version of the events of the evening. Since the facts are not so contrary to human experience as to defy belief, the trial court's acceptance of the police officers' version of the events of that evening was not an abuse of discretion. Since the trial court chose to adopt the police officers' version of the facts against which to weigh the question of the custodial interrogation of Leamons, we also accept them as the appropriate backdrop for our inquiry.

This brings us to the second question: Under the totality of the circumstances as set forth in the police officers' version of the events of the evening, was Michael Leamons responding to custodial interrogation when he admitted that the victim had been at his trailer earlier on the evening of the attack? Simply put, he was not.

■ Referring to the previous enumeration of factors as set forth in *Savory*, we note that Leamons was being questioned at his home, for a very short period of time, with no indicia of formal arrest, at a time when he was speaking to them voluntarily. Further, Leamons, as indicated in the record before this court, is a young adult of apparently stable mental makeup and average intelligence. Applying the objective test to Leamons' interview, we hold that his responses were not given during or as a result of custodial interrogation and that *Miranda* warnings were not required. Since *Miranda* warnings were not required, Leamons' motion to suppress was baseless, and the ruling of the trial court was correct.

### B

In a secondary matter also pertaining to pretrial motions, Leamons argues that the trial court erred in refusing to order a psychiatric examination of the victim in order to determine whether the child had a proclivity for lying.

The decision to order a psychiatric examination in a case involving a sex violation is vested in the sound discretion of the trial court (*People v. Rossi* (1972), 52 Ill. 2d 13, 284 N.E.2d 275) and may be ordered only when the defendant offers a compelling reason for it. *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367.

At the hearing on the motion, defense counsel represented to the court that he would produce a witness who would testify that the complaining witness had named several persons as his assailant on the evening of the attack. Additionally, there was some evidence that the victim had a past history of "nervous tension seizures," had had a

prior confrontation with Leamons, and did not have a good reputation for honesty in the community.

■ Based on these scant facts, we cannot say that the trial court abused its discretion in refusing to order a psychiatric examination of the victim. The situation here is vastly different than that found in *People v. Porcaro* (1959), 6 N.Y.2d 248, 189 N.Y.S.2d 194, 160 N.E.2d 488 (cited in *Glover* as circumstances requiring a psychiatric examination), wherein a defendant proffered medical testimony that the complaining witness' hymen was intact despite her allegations that he had engaged in intercourse with her on numerous occasions. Here, on the other hand, there was no evidence adduced contrary to the allegations of the complaining witness and no indication that the complaining witness' prior history of "nervous tension seizures" (the nature of which are nowhere apparent in the record) had any bearing on the witness' alleged proclivity to lie. Since there was no matter of record revealing a compelling reason to order a psychiatric examination of the complaining witness, it was not error for the trial court to refuse to do so.

### III. *Voir Dire*

■ Prior to trial, Leamons submitted a list of 48 questions he proposed to have asked during *voir dire*. He contends that the trial court committed reversible error in not asking all the potential jurors if they believed the defendant would have to present evidence or testify on his own behalf and also in not asking all the potential witnesses the same question. Leamons also argues that the trial court erred in not asking all the jurors whether they would give more weight to the testimony of a police officer than to a civilian. As authority for Leamons' arguments, he relies upon the case of *People v. Zehr* (1984), 103 Ill. 2d 472, which affirmed the appellate court decision in *People v. Zehr* (1982), 110 Ill. App. 3d 458, 442 N.E.2d 581.

Upon an independent examination of the *voir dire* proceedings conducted in this case, it is our opinion that the concerns expressed by the court in *Zehr* were adequately dealt with here. We first note that the entire venire was in the courtroom during the *voir dire* of the various panels. Secondly, the trial judge addressed the entire venire extensively, before any questions were presented to any of them. He indicated that there was no presumption of guilt from the fact that defendant was charged with a crime. He told the prospective venire that the defendant was presumed innocent and that the presumption remained with him throughout the trial. The entire venire was instructed that the defendant need not prove anything and was

not required to present evidence but rather might rely simply upon the presumption of innocence. The venire was told that as jurors they were the judges of the facts of this case. They were told that if they became convinced that the defendant was guilty as charged beyond a reasonable doubt, they must find him guilty, but that if after hearing all the evidence the venire was not convinced beyond a reasonable doubt of defendant's guilt, that they must find him not guilty.

On 12 different occasions in examination of the various panels, the court specifically asked the jurors, "You've heard the court's statement as to the general principles of law that govern all criminal cases, and this case. Do you have any disagreement with any of those principles of law?" The various jurors were also asked, "And in the event that the court instructs you further as to what the law is that governs this case after having heard all the evidence, there would be no reason for you to disregard the law, would there?"

In *Zehr*, the supreme court found as error the fact that three questions from among a list of 50 which were submitted by the defense prior to *voir dire* were not asked. The first question was if at the close of all the evidence and after the jury had heard the arguments of counsel they believed the State had failed to sustain the burden of proof and had failed to prove the defendant guilty beyond a reasonable doubt, would they have any hesitation whatsoever in returning a verdict of not guilty? Here, the trial court, prior to any questioning, instructed the jurors that if the State failed to prove the case beyond a reasonable doubt, they should return a verdict of not guilty. Further, the court specifically asked whether or not the jurors had any disagreement with any of the general principles of law in which he had previously instructed them and whether or not they would follow the law of the case as given to them in the instructions.

Secondly, in *Zehr*, the supreme court held as error the refusal of the trial court to ask a prospective panel of jurors whether or not they would hold it against the defendant if he decided not to testify in his own behalf. Here, the entire venire was instructed that the defendant need not prove anything and was not required to present any evidence but might simply rely on his presumption of innocence. Again, the panels were asked whether or not they disagreed with any of the court's statements of the general principles of law and this to us seems to have broached the problem of the defendant not testifying.

Finally, in *Zehr*, the supreme court held that the trial court should have asked the prospective venire whether or not they understood that the defendant was presumed innocent and did not have to offer

any evidence in his own behalf but rather must be proved guilty by the State. Here, again, the trial court specifically told the jury that the defendant need not testify and asked them if they had any disagreement with any of these principles of law. Under these circumstances, the third concern of *Zehr* has been satisfied.

In conclusion, the three concerns expressed by our supreme court in *Zehr* were sufficiently broached in this case to alleviate any possible error. Further, *Zehr* specifically indicated that the exact questions which were at issue in that case need not be asked, but rather the subject matter should be probed during *voir dire*. Here, the subject matter was sufficiently probed, and there was no error in the manner in which this *voir dire* was conducted.

## IV. REASONABLE DOUBT

Leamons argues that he was not proved guilty beyond a reasonable doubt because his conviction was based solely on the testimony of the Lockwood family which did not substantially corroborate the complaints of the complaining witness. The State responds that the testimony in an indecent liberties case need not be crystal clear and perfect as far as memory is concerned in order for such testimony to support a conviction.

*People v. Pazell* (1948), 399 Ill. 462, 78 N.E.2d 212, presents a factual scenario virtually identical to that in this case. In *Pazell*, the defendant was a 58-year-old employee of a large packing company in Chicago who, along with his wife and two sons, resided in a residential community populated by many children. Pazell was accused by a complaining witness of seven years of age who testified that at 4 p.m. on the afternoon of June 5, 1946, she was taken into the defendant's house and sexually assaulted. According to her trial testimony, she had suffered similar conduct by defendant in his house on five occasions earlier in the same year. Her testimony was corroborated to the extent that a playmate stated that she played with the complaining witness in defendant's backyard until the defendant told her to go home and took the complaining witness into his house.

An examining physician testified that he could not conclude whether the complaining witness had been the subject of a sexual assault or not. The complaining witness' mother stated her daughter's age and said that she knew her children and many others played in defendant's yard. The complaining witness' father testified that on June 9, 1946, he had accused the defendant of accosting his daughters but the defendant had denied the accusation.

The defendant's wife testified that her husband often chased the

complaining witness' brothers and sisters out of the yard because they stepped on the vegetables, broke the swings, and were generally destructive. Several character witnesses testified to defendant's reputation in the community for good moral character.

Turning to the issue of whether the defendant in *Pazell* was proved guilty beyond a reasonable doubt, the court recognized that where a conviction for taking indecent liberties with a child depends upon the testimony of the prosecuting witness, and the defendant denies the charge, there must be substantial corroboration of the prosecuting witness by some other evidence, fact, or circumstance in the case. The court noted several evidentiary matters which might be adduced in order to raise the corroboration to the clear and convincing standard. Included among these was the account of an eyewitness (see *People v. Sharp* (1943), 384 Ill. 503, 51 N.E.2d 554), and admissions or confessions of the defendant (see *People v. Crowe* (1945), 390 Ill. 294, 61 N.E.2d 348). The court recognized that each may be a source of substantial corroboration. However, in *Pazell,* the court was of the opinion that the record in the case failed to disclose any substantial evidence tending to corroborate the story of the seven-year-old prosecuting witness.

Turning to the case before this court, we find that the two previously mentioned matters of corroboration are present. While there was no eyewitness to the alleged act here, the complaining witness' brother testified that upon one of his returns to Leamons' trailer he heard Leamons and his brother (both of whose voices he had had prior opportunities to hear) in the rear of the trailer. He testified he heard Leamons ask his brother, "Does it hurt?" to which his brother first replied, "No," and then, "Yes." This provides substantial corroboration to the victim's story of what happened to him on the evening in question. Further, since we have previously decided that the statement given by Leamons to the police was properly admitted, this may be deemed as an admission of the defendant that the victim had been to his home earlier in the evening. This was another factor cited by the court in *Pazell* as indicative of corroborative testimony. Also, in the case at bench, there was testimony that the victim had been subjected to sexual activity earlier in the evening. This was a matter missing in *Pazell.*

Since in our opinion the evidence when taken as a whole substantially corroborates the victim's story of what happened to him on the evening in question, the jury verdict of guilty in this case must stand against defendant's claim of failure of proof beyond a reasonable doubt.

## V. Evidentiary Rulings

■ Leamons claims as error the fact that the victim's mother was allowed to recite all the facts of the statement given to her by her son concerning the details and name of the person who had allegedly committed a sexual attack on him. Leamons agrees that the mother should have been allowed to testify to the fact that a complaint was made, but argues that the introduction of the details of the complaint and name of the attacker was error. The State responds that by virtue of newly enacted legislation, specifically section 115—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat., 1982 Supp., ch. 38, par. 115—10), testimony concerning the details of an attack of a sexual nature are now clearly admissible. The State argues in the alternative that even if the admission of the details was error, the error was harmless, since the complaining witness testified about the attack and defense counsel cross-examined him.

Prior to the passage of article 115 of the Code of Civil Procedure of 1963, Illinois law largely limited testimony concerning corroborative complaints to rape cases and to the fact that a corroborative complaint was made. The law forbade recitation of the details of the complaint. See *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. McKee* (1977), 52 Ill. App. 3d 689, 367 N.E.2d 1000.

Since the evidence which was admitted at Leamons' trial was clearly not admissible under prior case law, it becomes a question of whether or not the previously alluded to statute changed that law. The two parties to this appeal take their natural stands. Leamons argues that the statute simply codifies prior case law, while the State argues that the statute would have no purpose if it were to do nothing to change prior law. Examining the legislative history of the Act reveals that on March 25, 1982, in the House of Representatives the sponsor of the bill stated:

> "It provides that, in a prosecution for a sexual act on a child under the age of 18, the child may testify that he or she complained of such act, and the person who heard the complaint may testify that it was made, in order to corroborate the child's testimony. In other words, the person who corroborates a testimony does not talk about the act itself. All he talks about is the fact that the child, in fact, did make the complaint, and that would be using corroboration of the child's testimony."

In light of this, it seems that Leamons' position is well taken that the admission of the details of the complaint by the mother was error.

■ Despite the fact that it was error, our opinion is that the error was harmless. In *People v. Robinson* (1978), 73 Ill. 2d 192, 383

N.E.2d 164, the supreme court held that the introduction of hearsay testimony concerning a corroborative complaint could be rendered harmless if all the facts involved in the complaint were later established through the complainant's testimony. The court noted that the most objectionable feature of hearsay evidence, and the main reason underlying its exclusion, is that opposing parties are unable to test the real value of the testimony by exposing the source of the assertion to cross-examination. In cases where defense counsel has the opportunity to, and in fact does, cross-examine the out-of-court declarant, the admissions of the detail of the hearsay complaint are error but harmless. Here, the complaining witness testified and was subject to cross-examination, rendering harmless any error which occurred when his mother related the details of the complaint made to her by her son.

██ The final evidentiary ruling complained of by Leamons is that the trial court precluded him from attempting to question the complaining witness' mother concerning the time she and her children were living in Texas. This period was from 1971 until the end of 1973 and before the complaining witness here was even born. According to his counsel's representation, Leamons was seeking to question the mother about a prior complaint she had made on behalf of one of her children. The substance of the claim was that the child had been sexually assaulted but the claim had later proved to be false. The State's Attorney objected to this line of questioning and the following colloquy occurred:

> "THE COURT: What is the relevance?
>
> DEFENSE COUNSEL: Prior false complaints.
>
> THE PROSECUTOR: How are you going to prove that up?
>
> DEFENSE COUNSEL: She told a person.
>
> THE PROSECUTOR: What person?
>
> THE COURT: Complaints about—excuse me just a moment. Complaints to who, of what?
>
> DEFENSE COUNSEL: Sexual assault on one of the boys.
>
> THE PROSECUTOR: What is the relevance of that?
>
> THE COURT: A false report, you say?
>
> DEFENSE COUNSEL: Yeah.
>
> THE COURT: Okay. What are you saying—.
>
> THE PROSECUTOR: What is the relevance?
>
> THE COURT: This is proper cross-examination in that it bears upon the credibility or the truth of her statement here today concerning what, whether or not [the victim] was victimized.

DEFENSE COUNSEL: Whether this witness is telling the truth.

THE COURT: About what?

DEFENSE COUNSEL: About what she said she was told by her son.

THE PROSECUTOR: Judge, it's—.

THE COURT: I think that is so remote that—and I think that is going to lead into such—lead us into all sorts of paths which would be difficult to establish whether or not a prior complaint to police—whether it was based upon—.

THE PROSECUTOR: You need the police officer.

THE COURT: The police officer, whether indeed it was a false report. I think that is so remote, and that would lead us to so many different areas of proof that I think I am going to sustain the objection on that. So you will have the record on that."

In our opinion, the issue was waived by virtue of not being in the post-trial motion and may only be considered if it is plain error. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) We note additionally that Leamons at no time made an offer of proof concerning the manner in which he would prove the prior false complaint, and, as such, we are in no position to determine whether the matter was subject to proper proof or not. Under these circumstances, we cannot find that the refusal to allow the defendant to go off into these realms of tenuous relevance was plain error and that therefore it was waived.

## VI. Prosecutorial Error

Leamons argues that it was reversible error for the prosecutor to ask him whether certain other witnesses who had testified before him were lying and that the error was compounded by the fact that the prosecutor then argued to the jury that Leamons had called the State's witnesses liars.

Once again, the error—if any—was clearly waived. The questions were asked without objection and were not raised as issues in defendant's post-trial motion. Under these circumstances, he is precluded from urging them on appeal. *People v. Koss* (1977), 52 Ill. App. 3d 605, 367 N.E.2d 1040.

## VII. Sentencing

■ Following a sentencing hearing, Leamons was sentenced to eight years' imprisonment, which is two years in excess of the manda-

tory minimum. Aggravated indecent liberties with a child is a Class X felony, the sentence ranges being between 6 years and 30 years with no possibility for probation. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.) In this appeal, Leamons argues that since the Unified Code of Corrections provides that before a sentence greater than the minimum may be imposed, certain factors in aggravation must be proved, and that since none of the factors in aggravation were proved here, this court must reduce its sentence to the minimum.

Although not cited by the State in their brief, *People v. Burton* (1981), 102 Ill. App. 3d 148, 429 N.E.2d 543, disposes of this issue. *Burton* was an aggravated-incest case where the defendant was sentenced to six years' imprisonment. This court noted that the list of aggravating factors given in section 5—5—3.2(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(a)(1)) includes the factor that defendant's conduct caused or threatened serious harm. We were of the view that harm to a victim is properly considered under this provision and that psychological trauma is a type of harm.

Consequently, the trial judge here properly relied upon the fact that this crime was of "great enormity in that the effect upon this child of tender years is incalculable about the psychiatric trauma, the shame and the effect of being called upon to testify in a trial of this case, the nature of the assault upon him by the defendant are all such to lead the court to believe that a minimum sentence is not an appropriate sentence ***." Under these circumstances, there was no abuse of discretion in sentencing the defendant to a period longer than the minimum provided by statute.

The decision of the trial court is affirmed in all aspects.

Affirmed.

TRAPP and GREEN, JJ., concur.