THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RODOLFO CARREON, Defendant-Appellant.

First District (1st Division)   No. 1—89—2390

Opinion filed January 27, 1992.

Randolph N. Stone, Public Defender, of Chicago (Frank Madea, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Terence Johnson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Rodolfo Carreon was found guilty of two counts of murder and armed robbery. Defendant was sentenced to natural life imprisonment. Defendant now appeals both his conviction and sentence. For the reasons which follow, we affirm.

Defendant had previously been tried and convicted of these charges, but the conviction was reversed and remanded for a new trial on appeal to this court. (*People v. Carreon* (1987), 162 Ill. App. 3d 990, 516 N.E.2d 372.) The record of this second trial indicates the following facts. At the outset of jury selection, the trial court informed all 53 members of the venire of "certain broad fundamental principles of law applicable in all criminal cases." The jurors were in-

formed that: the defendant is presumed innocent until proven guilty beyond a reasonable doubt; the burden of proving defendant guilty is on the State and defendant need not prove his innocence; and jurors would be duty bound to follow further instructions on the law that they would receive after hearing all of the evidence. The venire was then sworn to tell the truth during *voir dire*.

During defense counsel's examination of one of the prospective jurors, the following colloquy ensued:

"Q. [by defense counsel Ptacek:] As the judge told you, the defendant does not have to testify. He does not have to do anything.

Would you hold that against him if he does not testify?

A. [by venireperson Johnson:] I am not for sure.

Q. Do you think you would?

MR. LACY [for the State]: Judge, I am going to object.

THE COURT: The objection will be sustained.

I do not recall that I mentioned or went into that aspect. I think that presumes that jurors have actively participated in criminal trials before.

I will instruct the jury on this issue at the end of the case. I think it is unfair to ask a detailed legal question of jurors. The question is stricken.

MR. PTACEK: I would ask for a sidebar.

THE COURT: Ask another question please."

Venireperson Johnson was then asked whether she had any problems presuming defendant innocent and whether she would hold the fact that defendant was charged with a crime against him. Venireperson Johnson answered in the negative to both questions.

Following *voir dire* and prior to opening arguments, defendant moved for a mistrial. Defendant argued that the trial court erred in preventing him from asking the question at issue in the colloquy quoted above, adding that the trial court did not attempt to discover during its opening remarks whether any of the venirepersons would hold a defendant's failure to testify against him. The trial court responded that the State's objection had been sustained as to form, not as to substance. The trial court stated that defense counsel had asked a compound question, which the court believed was confusing to the venireperson. The trial court noted its surprise that defense counsel had moved to another line of questioning when the objection was sustained. The trial court also stated that the defense request for a sidebar had been denied in order that the trial not be delayed. The motion for mistrial was denied.

136

Following opening statements, the parties stipulated that if Maria Llamas were called to testify, she would state that she had seen Jose Casillas and Emilio Sanchez on November 26, 1983, and that they appeared in good health. Llamas would also have testified that she had later learned they were both dead.

Ignacio Amaya, who testified through an interpreter, was the State's first witness. Amaya testified that he resided in Durango, Mexico, but resided at 2121 N. Milwaukee Avenue in Chicago, Illinois, on November 26, 1983. At 7 o'clock that evening, Amaya was getting a haircut in defendant's barber shop. Afterwards, defendant invited Amaya to a tavern called Saloon de Mexico. The two men went across the street to the tavern. Once inside, defendant ordered a beer for himself and Amaya, then played pool. Later, a man asked defendant to play cards with him. After receiving permission from the owner of the tavern, defendant and this other man began to play cards in a room next to the bar. An hour and a half later, defendant left the tavern, but then returned to the card room for about half an hour. Defendant then came over to Amaya, who was seated at the bar and could see into the card room, and told Amaya to wait outside by the tavern door. Amaya saw defendant walk out of the tavern with the man who had invited defendant to play cards, as well as a second man. The two men went to get into a car; defendant told Amaya that he was going to ask for a ride. Defendant went to the car, then shouted for Amaya to join them.

Amaya sat behind the driver, while defendant sat behind the front passenger. The men drove north on Milwaukee Avenue to a traffic light and turned left. Two blocks later, the car again turned left, then stopped. The driver asked defendant if he lived at this location; defendant said he lived somewhere else.

Five seconds later, Amaya heard a gunshot right by his right ear. Amaya turned to see defendant holding a gun with both hands. Amaya saw the front passenger turn around as the driver fell over to his left. Amaya then heard another shot, and turned to see defendant still holding the gun. The front passenger also slumped over to his left. At this point, the car was moving and struck a parked station wagon. Amaya then reached forward to shut off the ignition.

Both Amaya and defendant left the vehicle through the driver's door. Amaya stood 10 to 15 feet from the car and saw defendant go through the driver's pants pockets. Amaya and defendant returned to defendant's barber shop, where defendant pulled out the gun and set it on the floor by the toilet tank. Defendant then attempted to wash some money which was full of blood. Defendant gave Amaya between

$80 and $180 of the washed money and told him to leave. Amaya went to his apartment, which was located across the street from the shop and adjacent to the Saloon de Mexico. Defendant lived in the same building, with Amaya's niece. Amaya stated that at the time, defendant had a mustache and beard.

On cross-examination, Amaya stated that he might be over five feet seven inches tall. He also stated that on November 26, 1983, he wore a mustache and curly hair, as he did that moment. He further stated that he was 37 or 38 years old while testifying. Amaya testified that although there was blood spattered inside of the car, no blood had gotten on his clothes. He did not call the police because he did not speak English.

Amaya stated that he was arrested, handcuffed and taken to a police station at 2 a.m. on November 28, 1983. Amaya admitted that he initially told the police that defendant was not involved in the shooting because he was afraid. Amaya later told the police that defendant had killed Casillas and Sanchez. On redirect, Amaya stated that he gave the money he received from defendant to the police.

The State then called Isidro Bravo, who on November 26, 1983, was the owner and bartender of the Saloon de Mexico. Bravo testified that on the evening at issue, he saw defendant playing cards with Porfidio Llamas in a small office in the back of the tavern. Later in the evening, defendant asked Bravo for money so that defendant could continue playing cards. Bravo told defendant he did not have any money. Defendant momentarily left the tavern; upon his return, he asked Bravo where Porfidio was because he had obtained more money. Bravo showed defendant where Porfidio was, but also told defendant he was closing the bar. Bravo did not know Porfidio Llamas by the name Jose Casillas.

Geoffrey Drigueros was the next witness for the State. Drigueros testified that on November 27, 1983, he lived at the corner of Armitage and Hoyne in Chicago, Illinois. He lived on the second floor of a two-flat with his family. In the early morning hours of November 27, 1983, Drigueros was awakened by a crash coming from outside his house. He first went into his washroom, then to the window. Drigueros saw "a station wagon and also another car almost on top of the station wagon." He ran down to the front door and went outside, where he saw a man leaning inside the second car.

Drigueros approached the man, switching from English to Spanish to talk to the man. Drigueros was about an inch away from the man. The man did not speak to Drigueros, who then noticed that a man inside the car seemed to be bleeding from the face. Drigueros told the

man outside the car he was going to call an ambulance or the police. Drigueros had been looking at this man for several minutes as these events took place. He identified the man outside the car in court as defendant. Drigueros spoke to the police, who transferred him to speak with an ambulance. He also spoke with police when they arrived at the scene minutes later. Drigueros testified that he had told the police that the man outside the car was a white Hispanic male, between 24 and 30 years old and between five feet five inches and five feet seven inches in height. In court, Drigueros estimated that defendant was about five feet tall.

On November 28, 1983, Drigueros identified defendant in a lineup. He testified that in the lineup, defendant looked different because defendant had a mustache and beard and was wearing a different shirt at the time he first saw defendant. At one point, Drigueros had the persons in the lineup stand with their backs to him to aid him in the identification.

Officer McInerney, who had been a Chicago police officer for the past 13 years, testified next. On November 27, 1983, during his patrol, he was assigned by radio at sometime between 2:30 and 3 a.m. to investigate an accident near the intersection of Armitage and Point. Upon arriving, Officer McInerney saw a two-door blue Chevrolet smashed against a station wagon. He also saw two bodies.

The first body was on the curb of the street near the driver's side of the Chevrolet. The body was facedown and appeared to be an Hispanic with black, wavy hair, wearing a black leather jacket and beige pants. There was blood all around the head and pants. The right pants pocket was pulled out. Officer McInerney later learned that this was Jose Casillas.

The second body was on its left side in the passenger seat of the Chevrolet and appeared traumatized. The front seat of the car was saturated with blood, but there was no blood in the back seat. Officer McInerney learned that this was Emilio Sanchez.

Detective Robert Smitka, who had worked for the Chicago police department for 25 years, testified that on November 27, 1983, he and his partner, Detective Paulnitsky, were investigating the double homicide of Jose Casillas and Emilio Sanchez. The detectives spoke with Bravo and Mr. Diaz, who were co-owners of the Saloon de Mexico. After this conversation, Mr. Diaz accompanied the detectives across the street to apartment 305. The detectives knocked on the door, which was answered by defendant. Detective Smitka noticed that defendant was clean-shaven, with redness under the nose and around the chin. When asked whether he ever had a beard and mustache, defendant

stated that he did until about six hours previous to their arrival, but had just felt like taking it off.

Detective Smitka then testified that defendant told the detectives that he had been at the Saloon de Mexico the night before with Amaya. Defendant told them that he had lost several hundred dollars gambling that evening. Defendant also stated that Amaya lived next door in apartment 303. The detectives advised defendant of his constitutional rights and called for a backup unit.

In response to this call, Detectives Sanford and Baker arrived on the scene. According to Detective Smitka, Amaya was located in apartment 303. Amaya was read his constitutional rights and stated that he would have no problem accompanying the police to the station. Detectives Sanford and Baker left with Amaya for Area 5 headquarters.

Detectives Smitka and Paulnitsky entered defendant's apartment. Detective Paulnitsky saw a live .38 caliber cartridge resting on a dresser. The bullet had a hollow point, which, according to Detective Smitka, was unusual. With defendant's permission, the police made a cursory search of defendant's apartment. Detective Paulnitsky recovered the .38 caliber bullet. The detectives also made a cursory search of defendant's barber shop, with defendant's permission. Detective Paulnitsky found a revolver holster in a drawer next to the barber's chair. Defendant then went with the detectives to Area 5 headquarters.

Detective Robert Collins, who had worked for the Chicago police department for 19 years, was working at Area 5 headquarters on November 28, 1983. At about 4 a.m. that day, Detective Collins and his partner, Detective Grant, questioned Amaya about the double homicide in question. According to Detective Collins, Amaya did not implicate defendant at that time.

About an hour later, these detectives spoke with defendant in a separate room at Area 5 headquarters. Defendant was again notified of his constitutional rights both orally and with a preprinted form. Defendant agreed to speak with the detectives at this time. This conversation took place in English, whereas Amaya had been informed of his rights in Spanish.

Defendant identified a photograph of Jose Casillas as someone with whom he had played cards and pool in the past. When asked about November 26, 1983, defendant told the detectives that he and Amaya had gone to the Saloon de Mexico for a beer and later to a bar called the Pancho Lopez. Defendant also told the detectives that he and Amaya returned to the Saloon de Mexico at about 10 p.m., at

which time he played cards with Casillas in a back room while Amaya remained at the bar.

According to Detective Collins, defendant stated that he lost about $200 and two payroll checks payable to his wife, Isabel Roman. Defendant then went back to the barber shop for more money and returned to the tavern. Defendant stated that the bartender told him that it was too late to play cards, so he sat and had a beer with Amaya. He and Amaya then walked home; he told Amaya he was going to rip his pants and tell his wife that he had been robbed to explain the loss of her payroll checks.

Detective Collins further testified that defendant had stated that on the night at issue, he had been wearing a dark jacket, a blue shirt and dark pants and shoes. Defendant also told the detectives that Amaya was wearing the same clothes that Amaya wore that night because Amaya had a habit of not changing his clothes too often. Detective Collins testified that Amaya was wearing a blue jacket, a dark shirt, brownish pants and gym shoes during his questioning. Detective Collins observed no blood on Amaya's clothes, which were not seized by the police. When asked, defendant told the detectives that he used to wear a mustache and goatee, but had shaved it off that Sunday afternoon because it began to itch. Defendant stated to the police that he only wore a beard for a week to 10 days at a time.

After questioning defendant for about an hour, Detectives Collins and Grant, along with another officer, went back to defendant's apartment. The detectives spoke with Isabel Roman, who signed a consent to search form. When the detectives asked Roman if she could remember what defendant was wearing on the evening at issue, she produced a blue shirt and a white tee shirt. According to Detective Collins, the shirts were bloodstained. Upon returning to the station, Detective Collins asked defendant to lift his shirt. Defendant had no cuts or scratches corresponding to the bloodstained areas of the shirts.

Detective Edward Heally testified that on November 28, 1983, Amaya gave a second statement implicating defendant. At this time, Amaya was released from custody and Detective Heally contacted Drigueros about attending a lineup.

Donald Smith testified that on November 28, 1983, he was chief firearms examiner for the Chicago Police Department Crime Laboratory. On that day, Smith received fired bullet jackets removed from the victims' bodies. An examination of these jackets led Smith to conclude that they were fired from the same gun. On December 19, 1983, Smith received a live .38 caliber cartridge. An examination of the bul-

let led Smith to conclude it was consistent with the jackets he had examined earlier.

Pamela Fish, who had worked for the Chicago Police Department Crime Laboratory for 7½ years, testified that on November 27 and 28, 1983, she received vials of blood identified as being taken from Casillas, Sanchez and defendant, as well as the blue shirt and white tee shirt retrieved from defendant's apartment. After an examination of the above, Fish concluded that: the Casillas blood sample was type B; the Sanchez blood sample was type O; and defendant's blood sample was also type O. The stains on both shirts were type B human blood. Fish testified that the bloodstains on both shirts were consistent with Casillas' blood and could not have been defendant's blood.

Finally, the State called Joanne Richmond, who worked for the medical examiner's office of Cook County on November 27, 1983. She had recovered bullet fragments from the bodies of the victims and determined that both had died as a result of gunshot wounds to the head. Casillas' wound was behind his right ear, and Sanchez' wound was behind his left ear; both wounds had stippling that indicated firing at close range. The State rested.

Defendant offered a stipulation that if Officer James Lanners were called, he would testify that he had interviewed Drigueros and wrote in his report that Drigueros saw a man leaning into the car, then heard two shots. Defendant rested.

After closing arguments, the jury found defendant guilty of two counts of murder and of armed robbery. The trial court sentenced defendant to natural life for each murder, with the sentence for armed robbery merged into the life sentence.

Defendant now appeals, contending that: (1) the trial court erred in precluding inquiry into the bias of venirepersons; (2) the State failed to prove him guilty of murder and armed robbery beyond a reasonable doubt; (3) the State denied him a fair trial by commenting on the victims' families during its rebuttal closing argument; and (4) his sentence is unconstitutional.

Defendant's first contention is that the trial court erred in precluding defense counsel from inquiring into the potential bias of venirepersons during *voir dire*. Generally, the scope and manner of *voir dire* rest within the discretion of the trial court. (See 134 Ill. 2d R. 234.) There are, however, exceptions to this general rule. For example, in *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, our supreme court determined that a trial court committed reversible error in refusing to question venirepersons on their attitudes concerning: (1) returning a guilty verdict if the State did not sustain its bur-

den of proof; (2) the presumption of innocence; (3) the fact that a defendant need not present any evidence; and (4) the fact that a defendant's failure to testify cannot be held against him in arriving at a verdict. (*Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064.) The *Zehr* court stated that " '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury.' " (*Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064, quoting *People v. Zehr* (1982), 110 Ill. App. 3d 458, 461, 442 N.E.2d 581, 584.) While questions on these issues need not be asked exactly as submitted by a defendant, the subject matter of the questions must be covered during *voir dire*. *Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064; see also *People v. Emerson* (1987), 122 Ill. 2d 411, 426-27, 522 N.E.2d 1109, 1114-15 (*Zehr* does not "prescribe a precise formula" and may be satisfied by general admonition coupled with subsequent discussion and questioning); *People v. Brooks* (1988), 173 Ill. App. 3d 153, 158, 527 N.E.2d 436, 439 (emphasizing that subject matter must be covered).

■ In this case, the trial court stated on the record that it did not inform the venire that a defendant's refusal to testify cannot be held against him. The trial court's characterization of its address to the venire is accurate on this point. Defense counsel's contrary assertion during *voir dire* was inaccurate.

The State relies primarily on *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137, in support of affirmance. In *Leamons*, the trial court did not specifically inform the venire that a defendant's refusal to testify could not be held against him. (See *Leamons*, 127 Ill. App. 3d at 1064-65, 469 N.E.2d at 1143-44.) Nevertheless, the appellate court held that the topic was adequately addressed where: (1) the entire venire had been told that defendant need not prove anything and was not required to present evidence, but might simply rely on the presumption of innocence; and (2) the venire panels were asked whether or not they disagreed with any of these general statements of law. *Leamons*, 127 Ill. App. 3d at 1065, 469 N.E.2d at 1144.

*Leamons* is distinguishable in at least two ways from this case. First, the record in this case indicates that while the trial court informed the venire that defendant was presumed innocent and need not prove his innocence, the venire was not instructed that defendant was not required to present evidence or that defendant could simply rely on the presumption of innocence. Second, in the *Leamons* line of cases, the venirepersons were given an opportunity to indicate that they had trouble with the general principles of law announced by the

trial court. (*Leamons*, 127 Ill. App. 3d at 1065, 469 N.E.2d at 1144 (venire panels were asked on 12 occasions); see *People v. Cole* (1988), 168 Ill. App. 3d 172, 175, 522 N.E.2d 635, 637; *People v. Williams* (1987), 159 Ill. App. 3d 527, 531-32, 512 N.E.2d 35, 38.) In contrast, while the record indicates that venireperson Johnson was asked whether she could presume defendant to be innocent, the record does not indicate that all venirepersons were given this same opportunity. Nor does the record show that the panels were asked if they disagreed with the general principles of law announced by the trial court.

In a factual context somewhat similar to this appeal, this court discussed the aforementioned cases at length and concluded that the trial court had erred. (See *People v. Starks* (1988), 169 Ill. App. 3d 588, 595-99, 523 N.E.2d 983, 988-91 (and cases cited therein).) Accordingly, we conclude that the trial court erred in precluding questions regarding a venireperson's attitude toward defendant's fifth amendment privilege.

However, we also conclude that the *Zehr* error in this case may be harmless. The issue here is similar to that presented in *Carter v. Kentucky* (1981), 450 U.S. 288, 67 L. Ed. 2d 241, 101 S. Ct. 1112, where the Supreme Court held that the fifth amendment privilege against self-incrimination entitles a criminal defendant to a "no-adverse-inference" jury instruction if requested. The Court later declined to reach the issue of whether *Carter* error may be considered harmless (*James v. Kentucky* (1984), 466 U.S. 341, 351, 80 L. Ed. 2d 346, 355, 104 S. Ct. 1830, 1837; see also *James v. Commonwealth* (Ky. 1984), 679 S.W.2d 238 (holding *Carter* error harmless on remand)), but several Federal appellate courts have determined that *Carter* error may be harmless. *E.g., Hunter v. Clark* (7th Cir. 1991), 934 F.2d 856 (6 to 5 decision *en banc*); *United States v. Ramirez* (5th Cir. 1987), 810 F.2d 1338; *Finney v. Rothgerber* (6th Cir. 1985), 751 F.2d 858, *cert. denied* (1985), 471 U.S. 1020, 85 L. Ed. 2d 310, 105 S. Ct. 2048.

As the *Hunter* decision notes, the Supreme Court has consistently held that a wide range of trial errors, including most constitutional errors, can be harmless. (*Hunter*, 934 F.2d at 860, citing *Arizona v. Fulminante* (1991), 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246; *United States v. Hasting* (1983), 461 U.S. 499, 508-09, 76 L. Ed. 2d 96, 106, 103 S. Ct. 1974, 1980-81.) Although the *Zehr* court did not state that defendant was constitutionally entitled to have the *Zehr* questions asked, the prophylactic rule announced in *Zehr* serves to protect the rights and privileges guaranteed by the fifth, sixth and fourteenth amendments.

Given this context, we now turn to consider whether the *Zehr* error in this appeal, assuming *arguendo* that it is of constitutional magnitude, is harmless. In doing so, we necessarily discuss defendant's second contention on appeal, that he was not guilty beyond a reasonable doubt of the offenses for which he was convicted.

The standard for harmless constitutional error is whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Constitutional error arising under the fifth and sixth amendments may be considered harmless beyond a reasonable doubt where the evidence of defendant's guilt is overwhelming. *Milton v. Wainwright* (1972), 407 U.S. 371, 33 L. Ed. 2d 1, 92 S. Ct. 2174.

■ In this case, Amaya testified that he was in the car with defendant when the victims were shot, heard the shots next to his right ear and saw defendant holding a gun. Amaya also testified that he saw defendant going through Casillas' pockets and was later given bloody money by defendant. Drigueros testified that he saw defendant leaning over the driver of the blue Chevrolet after it had hit the station wagon. Drigueros stood about an inch away from defendant for several minutes at the car. He identified defendant in a lineup and again at trial.

Detective Smitka testified that the police recovered an unusual .38 caliber bullet from defendant's apartment. Donald Smith testified that forensic examination indicated that this bullet was consistent with bullet fragments removed from the victims. Detective Collins testified that defendant's wife gave him the shirts defendant wore on the night in question. Pamela Fish testified that an examination indicated that bloodstains on the shirt matched the blood of the victim whom Drigueros and Amaya saw defendant leaning over; the stains could not match defendant's blood type. Detective Collins testified that Amaya did not have blood on his clothes and that defendant had no scratches or cuts which would correspond to the stains on the shirt retrieved from defendant's wife. Joanne Richmond testified that both of the gunshot wounds were near the back of each victim's head and had stippling which indicated that they were shot at close range.

Defendant contends that the evidence is not overwhelming; indeed, defendant argues that it is insufficient to sustain his convictions. This court will disturb a criminal conviction only when the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. (*E.g., People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.) The standard on appeal is whether a rational trier of fact, after viewing the evidence in the light

most favorable to the prosecution, could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.

Defendant argues that Amaya's testimony cannot sustain a conviction because Amaya was, in effect, an accomplice. Defendant notes that Amaya admitted to being at the scene of the shooting as it happened and was found to have bloody money by the police. Defendant also notes that Amaya has relocated to Mexico. Finally defendant argues that Drigueros' testimony was not credible because he identified defendant in a lineup "only after defendant was told to turn his back" and because he had described the man he saw to the police as five feet seven inches tall, but estimated defendant's height as five feet at trial.

When the identification of the defendant is a central question in a case, the testimony of one witness is sufficient for conviction, so long as the witness is credible and viewed defendant under conditions permitting a positive identification. (*People v. Richardson* (1988), 123 Ill. 2d 322, 353, 528 N.E.2d 612, 624.) The testimony of an accomplice, regardless of whether it is corroborated, may be sufficient to sustain a conviction if the trier of fact is convinced beyond a reasonable doubt. (See, *e.g., People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375.) Yet accomplice testimony is often problematic; the accomplice may have been promised leniency or harbor bias against the accused. Consequently, such testimony should be accepted with the utmost caution and be subjected to the highest scrutiny. (*Newell*, 103 Ill. 2d at 470, 469 N.E.2d at 1377; see *People v. Krankel* (1985), 131 Ill. App. 3d 887, 476 N.E.2d 777.) Nevertheless, whether accomplice testimony is sufficiently credible to support a conviction ultimately goes to the weight of the evidence; therefore, it is generally a function within the province of the trier of fact. See *Newell*, 103 Ill. 2d at 470, 469 N.E.2d at 1377.

In this case, the jury appears to have believed Amaya and Drigueros. The record indicates that Amaya sat directly next to defendant in the car, heard the shots right next to his ear and saw defendant holding a gun. The expert testimony indicates that the victims were shot in the backs of their heads at close range.

As for Drigueros, the record indicates he stood only an inch away from defendant for several minutes, which a reasonable jury could conclude was sufficient for a positive identification. Moreover, a reasonable jury could conclude that the height discrepancy and Drigueros' request that the persons in the lineup turn around at one point were consistent with the testimony that defendant was bent

over the driver of the blue Chevrolet as Drigueros observed him. In addition, the testimony of Amaya and Drigueros was supported by ballistics evidence and blood analysis suggesting that defendant was the shooter.

At oral argument, defendant suggested that the alleged errors could not be harmless, relying on the opinion rendered in his initial appeal. We note, however, that the failure to give an accomplice instruction in the initial appeal was deemed prejudicial, "especially in light of the fact that Amaya's testimony was the only direct evidence implicating Carreon." (*Carreon*, 162 Ill. App. 3d at 996, 516 N.E.2d at 376.) We note that the opinion in the initial appeal makes no reference to Drigueros' trial testimony or the scientific evidence, both of which appear in the record on appeal from this second trial. On this record, we conclude that there is overwhelming evidence of defendant's guilt of murder beyond a reasonable doubt in this case. *Cf. Richardson*, 123 Ill. 2d at 353-54, 528 N.E.2d at 624 (no reasonable doubt where two witnesses saw defendant during and after crime and identifications were supported by ballistics evidence).

Defendant also contends that his conviction for armed robbery should be reversed because the State failed to prove that property was taken from the "presence" of the victims. Armed robbery is defined as the taking of "property from the person or presence of another by the use of force or by threatening the imminent use of force" (Ill. Rev. Stat. 1983, ch. 38, par. 18—1) while one "carries on or about his or her person, or is otherwise armed with a dangerous weapon" (Ill. Rev. Stat. 1983, ch. 38, par. 18—2). Defendant's brief notes that the victims here were shot in the head at close range and then states that "it is clear property could not have been taken from the presence of a victim who is dead."

Defendant cites no authority for this conclusion. Though the question of whether a dead person may be present at the scene of a subsequent robbery may be arguable in a philosophical sense, Illinois law suggests that a dead person does have presence in the legal sense in some contexts. For example, in *People v. Thomas* (1990), 137 Ill. 2d 500, 561 N.E.2d 57, the defendant was convicted of aggravated arson, which provides for an increased penalty for arson where the defendant knew or should have known one or more persons were "present." (See *Thomas*, 137 Ill. 2d at 521, 561 N.E.2d at 65.) Defendant Thomas had stabbed a victim to death in a garage and then set the garage ablaze in hopes of concealing the murder. (*Thomas*, 137 Ill. 2d at 513, 561 N.E.2d at 61.) On appeal, Thomas claimed that the aggra-

vated arson statute applied only when a living person is present. *Thomas*, 137 Ill. 2d at 531, 561 N.E.2d at 69.

The supreme court rejected the "contention that one cannot commit aggravated arson if the person who the State alleges the defendant knew was present was in fact dead at the time he committed the arson." (*Thomas*, 137 Ill. 2d at 532, 561 N.E.2d at 70.) The supreme court reasoned that the purpose of the statute was to escalate the punishment for arson where persons were likely to be hurt or killed, concluding:

> "Defendant's guilt of aggravated arson should not depend upon the happenstance of whether the decedent expired before or after the defendant struck the match. [The victim's] death and the arson were both part of a closely related criminal episode. Whether she died shortly before or shortly after the fire was ignited is not material to the fulfillment of the purpose of the statute." (*Thomas*, 137 Ill. 2d at 532-33, 561 N.E.2d at 70.)

Similar to *Thomas*, the record here indicates a similar closely related episode of murder and robbery. (See also *People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481 (murder deemed committed "in the course of a robbery" in closely related episode where money was taken after victims were shot).) The purposes of the robbery and armed robbery statutes are not advanced by a construction which may encourage a robber to murder his or her victims first. Thus, the State did not fail to prove that property was taken from the "person" or "presence" of the victim in this case.

Defendant's third argument is that he was denied a fair trial because the State was allowed, over defendant's objection, to refer to the victims' families three times during closing arguments.

█ The State has persisted in commenting on the impact the death of a victim has on his or her family during closing arguments, despite the repeated admonitions of our supreme court that such comments are improper and unprofessional. (See *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.) The inflammatory and prejudicial nature of such comments is intensified when defense objections to them are overruled by the trial court. (*People v. Hope* (1986), 116 Ill. 2d 265, 278, 508 N.E.2d 202, 208; *People v. Faysom* (1985), 131 Ill. App. 3d 517, 522, 475 N.E.2d 945, 950.) Nevertheless, such comments may be harmless error where the evidence of defendant's guilt is overwhelming and the jury was instructed not to consider closing arguments as evidence. See *Faysom*, 131 Ill. App. 3d at 525, 475 N.E.2d at 952.

In this appeal, the record indicates that the evidence of defendant's guilt was overwhelming. The record also indicates that the jury was instructed that closing arguments are not evidence and that argument not based on the evidence should not be considered in reaching its verdict. Thus, the State's comments do not mandate a reversal of defendant's conviction in this case.

Finally, defendant argues that his natural life sentence is unconstitutional. Defendant contends that the statute under which his sentence was imposed (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c)) violates the principle of separation of powers implicit in the United States Constitution (see U.S. Const., arts. I, II, III) and explicit in the Illinois Constitution of 1970 (Ill. Const. 1970, art. II, §1). Defendant also argues that the statute violates the due process and equal protection clauses of both constitutions and the prohibition of cruel and unusual punishment set forth in the eighth amendment to the United States Constitution. See U.S. Const., amends. VIII, XIV; Ill. Const. 1970, art. I, §2.

■ Turning first to the separation of powers argument, defendant states in his brief that he is "mindful of the Illinois Supreme Court opinion in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059." *Taylor* rejected the exact claim made by defendant here under the Illinois Constitution. (*Taylor*, 102 Ill. 2d at 209, 464 N.E.2d at 1064.) Moreover, defendant cites no authority and makes no argument in support of this claim under the United States Constitution; thus, it is waived.

Similarly, defendant's eighth amendment, due process and equal protection arguments have been rejected on numerous previous occasions on both State and Federal grounds. (*E.g.*, *People v. Matthews* (1990), 205 Ill. App. 3d 371, 416-17, 562 N.E.2d 1113, 1140-41 (and cases cited therein); *People v. Foster* (1990), 198 Ill. App. 3d 986, 1001, 556 N.E.2d 1214, 1224 (and cases cited therein).) Defendant has failed to offer any compelling reason for departing from these decisions; consequently, we decline to do so.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.