THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RODOLFO CARREON, Defendant-Appellant.

First District (2nd Division)   No. 85—1175

Opinion filed October 13, 1987.

Steven Clark and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer and Robert M. Podlasek, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant-appellant Rodolfo Carreon was tried before a jury and found guilty of the murder of Jose Casillas and Emilio Sanchez, as well as one count of armed robbery. A death penalty hearing was subsequently held before the trial judge sitting without a jury, at the conclusion of which the court sentenced Carreon to life imprisonment for the murder and a consecutive extended term of 60 years for the armed robbery. On appeal, Carreon presents the following issues for review: (1) whether the trial court erred by refusing to give an accomplice witness instruction; (2) whether the trial court erred in denying Carreon's motion to quash his arrest and suppress certain evidence; (3) whether Carreon was denied a fair trial due to the death qualification of the jury; (4) whether the trial court erred in imposing a consecutive extended-term sentence for the armed robbery conviction. We reverse and remand for a new trial.

A review of the record discloses that on November 27, 1983, at approximately 2:30 a.m., the victims' bodies were found in the front seat of their car, which had crashed into a parked station wagon near 2700 North Point Street in Chicago. Both men had been shot in the head at close range. The defendant was arrested approximately 24 hours later at his apartment, was interrogated by the police, and was charged with the offenses of murder and armed robbery. Ignacio Amaya, Carreon's neighbor at the time of the incident, and who thereafter returned to his native Mexico, testified at Carreon's subse-

quent trial that he was present when the defendant allegedly shot the two victims.

Amaya related that on the night of the murders he went to the Saloon de Mexico with defendant and watched him play pool with the victim Casillas for approximately 1½ hours. After the pool game, Casillas asked Carreon how much money he had, to which Carreon replied "$400." After Casillas suggested that they play cards, Carreon agreed and the two men went into a back room. A short time later, Amaya saw Carreon come out of the back room and leave the bar. He later returned to the bar, told Amaya that he had lost all his money, and directed him to wait outside.

Amaya further testified that while he waited outside, he saw Casillas and Sanchez leave the bar and get into a blue car parked across the street. Shortly thereafter, Carreon also exited the establishment and went over to the blue car, asked the victims for a ride, and yelled to Amaya to join him. Amaya got into the backseat of the car with the defendant, despite the fact that he lived just across the street and said that he intended to go home. Amaya testified that after the group drove a few blocks, he heard a gunshot. He turned and saw Carreon with a gun, and then watched as Carreon shot the other victim. Both victims slumped over as the car crashed into a parked car. Amaya then got out of the car, walked about 10 to 15 meters away, and watched as Carreon went through the slain men's pockets, recovering the money he had lost gambling.

Amaya claimed that he then accompanied Carreon to the barbershop that the latter apparently owned and operated, where he waited while Carreon hid the gun "under the bathroom." He recalled that Carreon was full of blood, and that the gambling money he had recovered was bloody. After trying to clean the money under a faucet, Carreon gave Amaya $260 and told him to go home. Amaya thereupon took the money and went to his apartment. He did not call the police because of his alleged fear of Carreon.

The following day the police officers investigating the offense questioned numerous men who were at the Saloon de Mexico the previous evening or who saw the victims' car crash. From the information thus obtained, they suspected that Amaya must have had some knowledge about the shootings. Accordingly, they went to Amaya's apartment, placed him under arrest, and took him to the police station for interrogation. Amaya initially claimed that he did not know anything about the crime; however, when the police showed him the bloodstained money they had found in his wallet at the time of his arrest, Amaya implicated Carreon in the shootings. He subsequently

testified to the events described above before a grand jury, and was sent to Dallas, Texas, where his rent was paid by the State. While awaiting Carreon's trial, the State did not bring Amaya's presence in the United States to the attention of the immigration officials, despite his status here as an illegal alien.

■■ ■ The first issue Carreon presents to this court in this appeal is whether the trial court erred by refusing to give a cautionary accomplice witness instruction with regard to Amaya's testimony. At the instruction conference, Carreon tendered Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981), which states:

> "An accomplice witness is one who testifies that he was involved in the commission of a crime with the defendant. The testimony of an accomplice witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

Carreon argues on appeal that the trial judge's refusal to give this instruction to the jury warrants remanding the case for a new trial. We agree.

The purpose of the accomplice witness instruction has been cogently stated by this court as follows:

> "Due to the relationship of the witness and the State, there may be a strong motivation to testify falsely for the accomplice who seeks, hopes or expects lenient treatment by the State in return for favorable treatment. [Citation.] Thus a witness, knowing that his own guilt is detected, may seek to shield himself from punishment by purchasing immunity or leniency by falsely accusing others and procuring their conviction. Even if a promise of expectation of leniency is denied, its existence is always suspected. [Citation.] Therefore, a judicial instruction cautioning the jury that the testimony of an accomplice is subject to suspicion has been felt warranted. [Citation.]" (*People v. Riggs* (1977), 48 Ill. App. 3d 702, 705, 363 N.E.2d 137.)

The test of whether the accomplice witness instruction should be given is "whether there is probable cause to believe that [the witness] was guilty either as a principal, or on the theory of accountability." (*People v. Robinson* (1974), 59 Ill. 2d 184, 191, 319 N.E.2d 772; see also *People v. Cobb* (1983), 97 Ill. 2d 465, 476, 455 N.E.2d 31.) Moreover, the fact that the witness denies complicity in the crime does not eliminate the need to give the instruction if the totality of the circumstances shown by the record are sufficient to establish probable cause that the witness was accountable (*People v. Cobb* (1983), 97 Ill. 2d 465, 475-76, 455 N.E.2d 31) for, obviously, "the purpose behind the accom-

plice testimony instruction would be emasculated if the instruction could be avoided by a witness' mere assertion of a noncriminal intent" (*People v. Buffington* (1977), 51 Ill. App. 3d 899, 903, 366 N.E.2d 1099). Besides, it is axiomatic that a defendant is entitled to appropriate jury instructions which present his theories of the case to the jury when and if such theories are supported by the evidence. *People v. Unger* (1977), 66 Ill. 2d 333, 338, 362 N.E.2d 319.

Accordingly, we must determine if there was sufficient evidence, or probable cause, to indict Ignacio Amaya as an accomplice to the crimes, or to reasonably conclude that he might be such on the basis of accountability. Several cases are illuminating in this regard. (*People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Baker* (1982), 110 Ill. App. 3d 1015, 443 N.E.2d 270; *People v. Buffington* (1977), 51 Ill. App. 3d 899, 366 N.E.2d 1099.) For example, in *Cobb* two defendants were convicted of the murder and armed robbery of the owner and customer of a diner. On appeal, they argued that the accomplice witness instruction should have been given with respect to the testimony of a key State witness, Phyllis Santini.

Santini testified that on the night in question she had driven the defendants around for several hours when Cobb ordered her to stop the vehicle at a liquor store, and then to wait in the car and keep the engine running. Approximately 15 minutes after Santini had done what she was instructed to do, the defendants ran back to the car and told Santini to "get the hell out of here." Cobb allegedly grabbed Santini's hair when she said she did not know where to go. While she drove the defendants to a friend's house, she heard the defendants saying that they did not get as much money as they had expected. Santini stated that she did not know that they had committed murder and armed robbery until the next day, but that she did not call the police because she feared what would happen to her.

Noting that Santini had kept the motor running in the escape car while the crime was committed, spirited the defendants away from the scene, heard them discuss the crime, and yet did not call the authorities, the supreme court found that probable cause existed to indict Santini either as a principal or on the theory of accountability, despite her assertion of innocence. (*People v. Cobb* (1983), 97 Ill. 2d 465, 476, 455 N.E.2d 31.) The court also noted that Santini was the prosecution's most important witness, and absent her testimony the State would be left with only circumstantial evidence. (97 Ill. 2d 465, 478, 455 N.E.2d 31.) Accordingly, the court held that the failure to give the accomplice witness instruction was prejudicial error, and that the defendant was entitled to a new trial "on that ground alone." 97 Ill.

2d 465, 481, 455 N.E.2d 31.

In the case at bar, Amaya's testimony demonstrates that he was at the Saloon de Mexico while the defendant gambled with the murder victims. At closing time he waited outside the bar at Carreon's request after Carreon told him that he had lost all of his money. Although Amaya lived across the street from the Saloon de Mexico and stated that he wanted to go home, when Carreon asked the victims for a ride and shouted to Amaya to "come on," he got into the backseat of the car with the defendant. Amaya testified that while the group was driving Carreon shot Casillas and Sanchez. After the car crashed, Amaya got out of the vehicle, but did not leave or seek assistance. Instead, he watched as Carreon went through the victims' pockets. He then went with Carreon to his barbershop and remained there while Carreon hid the gun and tried to wash the blood off the money. After accepting $260 of the bloodstained money taken from Carreon, Amaya went home and never called the police, stating that he feared what Carreon would do to him.

█ In sum, Amaya disclosed that he was with the defendant before, during, and after the shootings. Notwithstanding his profession of innocence based on his alleged fear of the defendant, we believe probable cause existed to indict Amaya for the offenses, particularly when one considers that when he was initially taken into custody for questioning he possessed money linking him to the crime. The case law is replete with instances in which our court has upheld convictions based on similar evidence. For example, in People v. Morgan (1977), 67 Ill. 2d 1, 364 N.E.2d 56, our supreme court held that the armed robbery conviction of a defendant who attached himself to a group bent on criminal acts becomes accountable for any wrongs committed even though he may not actively participate in the act. (67 Ill. 2d 1, 8, 364 N.E.2d 56.) The court found that the evidence was sufficient to prove accountability for robbery and murder where the defendant was present at the scene of the crime and shared in the proceeds, a set of facts strikingly similar to those at bar. 67 Ill. 2d 1, 10, 364 N.E.2d 56.

█ Surely the rationale for giving the accomplice witness instruction applied to the instant case. Amaya testified that he was taken before the grand jury as the State's main witness, and after testifying in that forum, he was flown to Dallas, Texas, where his first month's rent was paid by the State. Furthermore, although the State knew he was in the United States illegally, it never brought his status to the attention of the immigration authorities. It should also be noted that the State caused Amaya to be brought here from Mexico, where he is presently living, to testify. Obviously, Amaya had "a strong motivation

to testify falsely" in the hope of receiving "lenient treatment by the State in return for favorable testimony," or "to shield himself from punishment by purchasing immunity or leniency by falsely accusing others and procuring their conviction." *People v. Riggs* (1977), 48 Ill. App. 3d 702, 705, 363 N.E.2d 137.

Nor can we justifiably rule that the failure to give the requested instruction constituted harmless error, especially in light of the fact that Amaya's testimony was the only direct evidence implicating Carreon. In any event, our supreme court has held "[t]he rule is well settled that a court will not weigh the evidence where the question is whether an instruction is justified." *(People v. Unger* (1977), 66 Ill. 2d 333, 342, 362 N.E.2d 319.) We accordingly hold that the failure to give the accomplice witness instruction constitutes prejudicial error warranting a reversal of the trial court's decision and a remand for a new trial. We now turn to those issues raised by the defendant which will be relevant on remand.

■ The first additional issue we address is whether the trial court erred in denying Carreon's motions to quash his arrest and suppress certain evidence which he contends was the fruit of an illegal search of his apartment. A pretrial hearing was held to consider these motions at which the following testimony was presented.

Detectives Roland Paulnitsky and Robert Smitka, who were assigned to investigate the murders, testified that the first person they interrogated was Joe Triqueros, who lived near the scene of the crime. He told them that he heard the car crash, rushed outside, and saw a Hispanic man, 5 feet 5 inches to 5 feet 7 inches with a mustache, leaning into the victims' car. The officers then learned from Sanchez' sister that her brother had been at the Saloon de Mexico shortly before the shootings. She also told them that she had talked to Casillas during the late evening of November 27, and he told her that he and Sanchez had won a large sum of money from a Hispanic man with a mustache. The detectives then went to the Saloon de Mexico at approximately 2 a.m. on November 28 and talked to two men, Isidro Bravo and Helio Diaz, both of whom told the officers that a barber whose shop and apartment were across the street from the bar was gambling the previous evening with the victims and had lost a large amount of money. The barber was a regular customer who often gambled and lost heavily.

After this conversation Diaz accompanied them to an apartment building across the street from the bar. Paulnitsky testified that they went to the defendant's apartment, knocked on the door, and announced that it was the police. Paulnitsky also related that their guns

were not drawn. Carreon answered the door, and Paulnitsky noticed that he did not have a mustache but that there was a red irritation on his upper lip. He asked Carreon about it, and Carreon told him that he had shaved his mustache six hours earlier. In response to further questioning, Carreon admitted that he had been gambling the previous evening in the Saloon de Mexico. Carreon then invited the officers into his apartment. The officers noted that a woman was asleep on the couch. After advising Carreon of his rights, the officers asked if they could look around, to which Carreon replied "[F]eel free." Paulnitsky subsequently recovered a .38 caliber bullet from the top of a dresser.

According to the police, after about 15 minutes in the apartment, Carreon took them downstairs to his barbershop and allowed them to look around while Carreon sat in a chair. Paulnitsky asserted Carreon was not handcuffed. They then took Carreon to the police station, and only then did they handcuff him. At approximately this time they also went to Amaya's apartment and transported him to the station as well. The detectives testified that they placed Carreon in a locked interview room, read him his rights, and questioned him for 10 or 15 minutes. Officer Collins subsequently interrogated him after again reading him his rights. The officers stated that the defendant was not threatened in any way or beaten at any time.

The defendant presented numerous witnesses in support of his motions. Helio Diaz testified that after he was questioned by Detectives Paulnitsky and Smitka at the Saloon de Mexico, he agreed to escort the officers to Carreon's apartment. Diaz claimed that the police told him to knock on Carreon's door and say that he wanted to talk to Carreon about something important. Diaz asserted that while he complied with this direction, the officers took their guns out. When Carreon answered the door, the officers ordered Diaz to leave. Lilia Amaya, witness Amaya's niece, testified that she was asleep in Carreon's apartment when she was awakened by loud knocks. She related that two officers came into the apartment with guns in their hand and handcuffed the defendant, and proceeded to search the apartment for 30 minutes. She did not know if the officers found anything because they did not speak Spanish.

Carreon testified that he answered the door when he heard Diaz say that he needed to talk about something important. Carreon averred that when he answered, two police officers immediately grabbed him and put a gun to his head. After telling Diaz to leave, the officers handcuffed Carreon and searched the apartment. When questioned about his mustache, Carreon told the officers that he had

shaved it off two or three weeks earlier. He directed the officers to the bullet on the dresser when they asked if he had any guns or bullets. Carreon also stated that he was never advised of his rights, and that after they searched the apartment for approximately 30 minutes, the officers took him downstairs and searched the barbershop. After searching the shop for nearly an hour, the officers transported him to the police station for interrogation. Carreon claimed that he was handcuffed to a wall and never read his rights, and when he asked to see a lawyer he was physically beaten.

Elias Bravo testified that he went to the barbershop while the officers were searching, and noticed that the defendant was sitting in a chair with his hands behind his back. The officers told Bravo to leave. He left, and did not see anything else.

After hearing argument, the trial court denied the defendant's motions to quash the arrest and suppress certain evidence, reasoning first that the information known to the arresting officers was sufficient to establish probable cause to arrest, and second, that the warrantless entry into Carreon's apartment was proper because the defendant invited them in. Carreon argues on appeal that the trial court erred when it denied his motions, contending that there were no exigent circumstances justifying the warrantless entry and search of his apartment, and that the officers did not have probable cause to arrest the defendant once they were in the apartment.

The testimony related above illustrates that the defense witnesses and the police relate drastically different accounts of the arrest and the search of Carreon's apartment. Therefore, a resolution of the issues of whether the police proceeded legally is entirely a question of credibility. This court in a prior case stated:

> "[T]hese are questions of the credibility of the witnesses involved and the weight to be given the evidence, which are issues for the trier of fact [citation], and we will not substitute our judgment thereon [citation] where, as here, the evidence is conflicting [citation], and we have had no opportunity to observe the witnesses and assess their credibility." (*People v. Conley* (1983), 118 Ill. App. 3d 122, 132, 454 N.E.2d 1107.)

Moreover, in reviewing the decision of the trial judge regarding the suppression of a confession, his decision should not be reversed unless it was contrary to the manifest weight of the evidence. *People v. Metoxen* (1984), 121 Ill. App. 3d 472, 477, 459 N.E.2d 975.

We hold that the trial court's rulings denying Carreon's motions were not against the manifest weight of the evidence. Regarding the alleged error in the warrantless entry, the police testified that Car-

reon consented to their entry, and that he allowed them to look around, a reasonable explanation which the trial court obviously considered to be truthful. Neither can the trial court's determination that the officers had probable cause to place the defendant under arrest be said to be against the manifest weight of the evidence. Even before they ever saw the defendant, the officers had Triqueros' description of a man who was at the scene of the crime shortly after the shooting. Sanchez' sister, Diaz, and Bravo then told them that the victims were gambling the prior evening with a man who fit that description. Their suspicions were enhanced when they went to Carreon's apartment and noted that Carreon not only fit the description but that his upper lip bore an irritation indicating that he may have recently shaved off his mustache. Under these circumstances, we believe the trial judge's decision was not against the manifest weight of the evidence. Accordingly, there is no need for this issue to be relitigated on remand.

■ We now turn to Carreon's argument that the death qualification of the jury, *i.e.*, questioning potential jurors on their views regarding imposition of the death penalty, denied him a fair trial by an impartial jury. The record discloses that the State, in response to a pretrial defense motion for disclosure, announced its intention to seek the death penalty in the event Carreon was found guilty. Prior to *voir dire*, defense counsel advised the court that Carreon wished to waive his right to a jury at sentencing, and he moved that the prospective jurors not be death qualified since the jury would not consider defendant's eligibility for the death penalty. The State objected and argued that the jury should be death qualified, asserting that Carreon's waiver would not have any validity if he changed his mind after a guilty verdict. The judge ruled that he would accept the waiver but that he would nevertheless death qualify the jury based on his conclusion that Carreon's pretrial waiver would not be binding if he changed his mind after trial. Carreon then refused to tender a sentencing jury waiver since he insisted upon making it contingent upon the granting of his motion to bar death qualifying the jury. At the ensuing *voir dire*, 11 potential jurors were excused for cause because of their opposition to the death penalty.

Carreon contends that the death qualification of the jury after he agreed to waive a jury at the sentencing hearing deprived him of a fair trial by an impartial jury. In contrast, the State argues that death qualification did not produce a jury which was unduly biased in favor of conviction. We first note that the defendant's argument that he was prejudiced by death qualifying the jury is meritless based on the

recent decision in *People v. Erickson* (1987), 117 Ill. 2d 271, in which our supreme court held that "[i]t is well established that a jury questioned regarding the imposition of the death penalty is presumed to be a fair jury on the question of guilt and innocence." (117 Ill. 2d 271, 292.) Carreon has made no showing to overcome this presumption. However, *Erickson* also establishes that "where a pretrial waiver of the sentencing jury is tendered and the court ascertains that it is voluntary and knowing, it must be accepted." (117 Ill. 2d 271, 287.) In another case, our supreme court stated that the State's right to pose death penalty questions "does not come into effect where *** the jur[y] that consider[s] the issue of guilt will not consider eligibility for the death penalty." (*Daley v. Hett* (1986), 113 Ill. 2d 75, 82, 495 N.E.2d 513.) Accordingly, should Carreon on remand wish to waive his right to a jury at the sentencing phase, the court will be obligated to accept the waiver, provided it was voluntary and knowing, and it would be precluded from death qualifying the jury.

The final point Carreon raises on appeal is that the trial court's imposition of a consecutive extended 60-year sentence on the armed robbery conviction was error. However, the law is clear that his sentencing argument is moot now that his conviction is being reversed on other grounds. *People v. Wilkerson* (1981), 87 Ill. 2d 151, 160, 429 N.E.2d 526.

Accordingly, we reverse the decision of the trial court and remand the case for a new trial on the ground that the failure to give a cautionary instruction on accomplice witness testimony denied the defendant a fair trial.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.