THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENNY JORDAN, Defendant-Appellant.

First District (2nd Division)   No. 1—91—1117

---

Opinion filed May 25, 1993.—Rehearing denied June 24, 1993.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, and Stuart K. Jones, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Sheila McGinnis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Benny Jordan was convicted by a jury of two counts of first-degree murder and was sentenced to a term of 35 years in the custody of the Illinois Department of Corrections. At defendant's trial, Larry Heard, a Chicago Housing Authority security guard, testified that around midnight on May 16, 1989, he and his partner observed a large cluster of teenagers near the corner of 13th and Throop Streets. The two guards circled the block and when they returned to the gathering, the teens dispersed, scattering in all directions. In the middle of what had been the circle of people was a body lying in a pool of blood and riddled with what appeared to be bullet holes. Earlier at trial, the victim had been identified by Edna Mix as her grandson, Jermaine Rhodes.

A search by a police crime lab team of the area proximate to where the body lay produced three unexpended .22 caliber pistol rounds and seven shell casings from a nine-millimeter weapon. An autopsy confirmed that Rhodes had died of 11 gunshot wounds to the lungs and skull, eight entry and three exit. The medical examiner who performed the autopsy recovered five slugs and the fragments of a jacketed round from the body. The parties stipulated that four bullets were fired from a nine-millimeter weapon and one was from a .38 caliber firearm.

Tyrone Atkins Henderson, a/k/a Tyrone Atkins (Atkins), called by the State, admitted that he was then serving a nine-year sentence, having been convicted of possession of a controlled substance with intent to deliver. He testified that he had known the victim his "whole

life from around the neighborhood," and that he did not learn of his death until the day after the shooting when he met with the police. Atkins stated that on the night of the shooting, he was not at the scene, but was at 906 South Ada Street, where he resided with his grandmother. He professed no knowledge of anyone named Crack or Sinbad, nor did he recognize their actual names, Brian and Sidney Hoard. Although he remembered the police interviewing him concerning the murder of Rhodes, he denied giving a statement on the matter and also denied that he spoke with Assistant State's Attorney Campanelli, although he admitted signing a written statement in the presence of four officers. He then told the jury that after he signed the statement, the police took him home, where he complained to his mother that "they beat him up," but he did not seek medical assistance or advise authorities that he was brutalized.

On cross-examination, Atkins related how on the night of the shooting, the police arrested him and brought him in handcuffs to the station house and that once there he was handcuffed to a pipe in a small room and informed that he was to recite all that he heard the interrogating officer say. When Atkins refused to comply, the officer repeatedly hit him about the head and groin. He reiterated on cross-examination that he knew nothing about the shooting of Rhodes and stated that although the written statement he signed was also signed by a "Ms. Henderson," his mother, Priscilla Henderson, did not sign it and did not arrive at the station house until she accompanied him there a second time, this time to complain about the brutality he claimed to have endured. On redirect, Atkins conceded that although his mother was incensed by the beating, she took no action other than to curse and berate the officer he implicated as being the perpetrator.

Mary Lewsader, a Chicago police department youth officer, testified that, in accordance with department regulations, she was present throughout the interview with Atkins because he was a minor. She recalled that during the entire time that Atkins was being questioned by Assistant State's Attorney Campanelli, Atkins' mother was in the room along with them. She identified for the record the written statement that Campanelli prepared and which she saw Atkins sign and initial. She also recalled that she had observed Ms. Henderson sign the paper as well. On cross-examination, she denied seeing anyone strike Atkins, and while she did not remember his bearing any marks or bruises that evening, she admitted that she had no idea how long he had been held prior to her arrival.

Detective Eugene Simpson testified that on May 17, 1989, he was detailed to investigate Rhodes' murder, and that he and his partner

received word from Warren Hoard that Tyrone Atkins had witnessed the shooting. The officers picked Atkins up at his mother's house and, after receiving her permission, drove him to the station. There, Atkins claimed ignorance of any shooting that evening until his mother appeared at the station and spoke to him, after which he expressed a desire to tell the truth. According to Simpson, Atkins then informed him that he sold cocaine for defendant, that he was robbed by Rhodes, that he told defendant of the robbery, and that after defendant had confronted Rhodes about the robbery, "he shot him."

The next day Simpson returned to Atkins' home and asked that he and his mother return to the station for further interviews. This time Atkins told the officers that he dealt cocaine for Brian and Sidney Hoard, whom he referred to respectively as Crack and Sinbad, and that on the day of the shooting he was robbed at gunpoint of $50 and a quantity of cocaine by an unknown man. Immediately thereafter, he reported the theft to Crack, who alerted his brother, and the two, together with Atkins, returned to the scene of the robbery where they encountered Rhodes, whom Atkins accused of robbing him. He also informed the officers that defendant was present at the scene of the shooting. Atkins described how Sinbad struck Rhodes with his weapon, after which Crack fired several shots at Rhodes with an Uzi-type submachine gun. When Rhodes fell to the ground, defendant announced that they could not leave him "like that," and fired two shots at the victim. After signing the written statement prepared by Assistant State's Attorney Campanelli, Atkins identified defendant through a one-way mirror as being the person he saw fire the last two rounds at Rhodes.

Simpson interrogated defendant that evening also, and after being "Mirandized," defendant denied any knowledge of the shooting or involvement in it. After being advised that other witnesses had placed him at the scene when the victim was shot, defendant professed a desire to tell the truth. He told the police and Assistant State's Attorney Campanelli, who was in the interrogation room, that he observed Atkins being held up at gunpoint and advised Sinbad of the robbery. Sinbad, holding a weapon at his side, asked for defendant's help and handed him the weapon. Sinbad then told him to watch where the robber fled while he went for Crack.

Defendant stated that he lost sight of the robber for a short while but reacquired sight of him a few minutes later speaking to Rhodes and a man in a wheelchair. When Sinbad and Crack returned, Sinbad accused someone of the robbery and then began shooting at Rhodes. While the shooting went on about him, defendant maintained that he

watched the man in the wheelchair, who he thought was reaching for the weapon hidden beneath his leg. He aimed the pistol that he obtained from Sinbad at the man but before he fired a round, someone turned the wheelchair away from him and pushed its occupant in the opposite direction. He fired three shots at the fleeing wheelchair before his weapon jammed, whereupon he ran, and as he tripped over Traveres Williams, the weapon discharged a final time.

Assistant State's Attorney Campanelli corroborated much of what Detective Simpson related and added that, after Atkins gave his statement, Campanelli requested that all the police officials leave the room, whereupon he asked Atkins how the police had treated him, to which Atkins replied that they had treated him well. After identifying Atkins' written statement, Campanelli recited its contents to the jury.

In his defense, defendant called Traveres Williams, who testified that on the night of the shooting, he was walking with defendant in the vicinity of the scene, and upon hearing what they thought were gunshots, the two threw themselves to the ground in order to avoid being shot, and that defendant stayed next to Williams while shots were being fired. He estimated that they were about 40 feet, or about six car lengths, from the source of the shooting. Williams was struck in the hand and both legs by stray bullets, and was dragged by defendant to his home. Although he recalled that defendant had a gun in his hand while on the ground, he did not remember his firing it.

In rebuttal, it was stipulated that Williams had been adjudicated delinquent in October 1987, for strong-arm robbery, and sentenced to one year's probation. The State also called Chicago police officer Jack Boock, who related that during an interview of Williams in his hospital room two days after the incident, Williams told him that while on his way to his girl friend's home, he came upon Crack and Sinbad Hoard and someone he referred to as "Terrell" as they confronted Rhodes regarding the robbery of Atkins. Williams recalled that Sinbad had a pistol and Crack had an Uzi-like machine gun. After one of the Hoards hit the victim in the face, Crack released a burst from his weapon, aimed at the victim. Williams also recalled seeing defendant near the shooting and told Boock that at the time defendant carried a gun.

## I

On appeal, defendant asserts three separate allegations of error: (1) that his trial counsel's failure to tender instructions on evidentiary questions and on the defense of justification constitutes ineffective assistance of counsel necessitating a new trial; (2) that because the in-

struction on justification was necessary to ensure the fundamental fairness of his trial, the court's failure to charge the jury *sua sponte* mandates reversal of his conviction and a new trial; and (3) that since the court considered in aggravation a factor which was implicit in the offense charged, the sentence imposed is infirm, thus requiring remandment for a new sentencing hearing.

Defendant, relying on the seminal cases of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, first charges his trial counsel with ineffective representation because he did not tender jury instructions which would provide the jury with the proper legal prism through which it could view the facts presented at trial. He specifically refers to counsel's failure to tender instructions on the weight to be given to the prior inconsistent statements of the State's principal occurrence witness, and another instruction which would have informed the jury that it could find that defendant justifiably used great bodily force during what he perceived to be a lawful citizen's arrest of an individual who had committed an armed robbery, which would exonerate him for the homicide. The State counters that the failure to tender the instructions constituted conscious trial tactics which this court may not question unless palpably erroneous. The State alternatively urges that in the event we fault defense counsel's representation, since the evidence so overwhelmingly supports the jury's verdict of guilty, any deficiency on the part of counsel is insufficient to raise doubts about the accuracy of the jury's finding.

In *People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089, the supreme court explained that a determination of effective assistance consists of two separate inquiries. To put forth a cognizable inadequate representation claim, defendant must prove:

> "(1) that his counsel made [an] error[ ] so serious, and his performance was so deficient, that he was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment to the United States Constitution, and (2) that these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable." (*Caballero*, 126 Ill. 2d at 259-60, 533 N.E.2d at 1091, citing *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

With regard to the first prong, defendant fails to satisfy his burden unless the record reflects that his attorney did not render " 'reasonably effective assistance' " based on a standard of "objective reasonableness under 'prevailing professional norms,' " and in so doing defendant must overcome the "strong presumption that the chal-

lenged action or lack of action might be the product of 'sound trial strategy.'" *Caballero*, 126 Ill. 2d at 260, 533 N.E.2d at 1091, quoting *Strickland*, 466 U.S. at 687-89, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-65.

A defendant establishes actual prejudice under the second aspect of *Strickland* by convincing that a reasonable probability exists that had counsel not erred, the trier of fact would not have found him guilty beyond a reasonable doubt. (*Caballero*, 126 Ill. 2d at 260, 533 N.E.2d at 1092, citing *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) A reasonable probability is one that is sufficient to undermine the confidence of the outcome of defendant's trial after considering the evidence presented to the jury in its totality. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) A reviewing court must keep ever present the recognition that it is to give great deference to the performance of counsel and resist the temptation to second-guess a particular decision or omission. *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2065-66.

## A

The first error which defendant believes demonstrates his trial counsel's prejudicial incompetence concerns the non-Illinois Pattern Jury Instruction tendered by the State and amended by the court which advised the jury that it could consider the written, signed statement of Tyrone Atkins as substantive evidence. The instruction, which generally tracks the language of section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.1), provided:

"There is evidence that Tyrone Atkins has previously written or signed a statement which is inconsistent with his testimony in this courtroom.

That prior statement may be considered by you as if testified to by Tyrone Atkins in this courtroom.

You are the sole judges of the believability of the evidence and the weight to be given it."

Defendant posits that this instruction confused the jury and may have led it to believe that it could consider not only Atkins' written statement but also any one of the earlier inconsistent oral statements which tended to put defendant in an even more culpable light than the written one. He suggests that his counsel was professionally deficient by not offering an instruction which would admonish the jury that it could not ascribe any substantive weight to the oral state-

ments. To demonstrate counsel's further incompetence, he points to the current Illinois Pattern Jury Instructions, Criminal, No. 3.11 (3d ed. 1992) (IPI Criminal 3d), which was amended, but after this case arose, to address the substantive admissibility of prior written statements, and which takes pains to distinguish oral inconsistent statements offered to impeach from written statements to be considered substantively. He concludes that counsel's failure to act prejudiced him by allowing the jury to base its verdict on otherwise incompetent evidence.

■ Defendant's argument falls short of proving either prong of *Strickland*. Under its first prong, his argument fails to rebut the strong presumption that the decision not to offer an instruction was not a part of the conscious tactical effort on counsel's part to obscure as much as possible Atkins' earlier extrajudicial statements. At the instructions conference, counsel made a concerted attempt to persuade the court that no instruction with regard to any of Atkins' earlier statements, both oral and written, should be given as counsel believed that such an instruction would unduly strengthen the weight the jury would accord to the admissible written statement. It would be fully consistent with that line of reasoning for defense counsel to decline to offer an instruction which, by contrasting the prior oral statements offered to impeach with the written statement offered for its substantive value, would sharply refocus the jury's attention on those earlier statements. Counsel may have reasonably believed that his client was best served by having all of Atkins' prior statements seen as a hopelessly jumbled mass, thus further underscoring his argument that the jury should find all his prior statements, both written and oral, incredible. And, since that could be an objectively reasonable professional determination, we have no cause to question its wisdom.

Additionally, even were we to find the decision to tender no additional instruction which expressly informed the jury that it could consider only Atkins' written statement as evidence of defendant's guilt to be professionally unreasonable, defendant does not convince that the jury actually considered any of the oral statements for their substantive truth. Thus, he has failed to establish actual prejudice resulting from his counsel's mistake.

In accord with Supreme Court Rule 451(a) (134 Ill. 2d R. 451(a)), the non-IPI instruction given was sufficiently clear and did not misstate the law. It informed the jury that Atkins had made a prior written statement which was inconsistent with his testimony given in court and that the jury could treat that statement as if it were presented to it in court. The instruction expressly limited its consider-

ation to the prior written statement, and the record does not indicate that the jury did not understand the instruction or that it did not adhere to it by considering the substantive value of one or all of the oral statements.

Defendant reasons that since the prior oral statements tended to inculpate defendant to a greater degree and identified him as one of the principals for whom Atkins sold narcotics, the jury may have based its finding of guilt on those more "damning," yet inadmissible, statements. He implicitly concludes that this hypothetical possibility sufficiently undermines the confidence in the verdict to warrant a new trial. However, *Strickland* demands more than the mere possibility of prejudice, rather, it calls for a "reasonable probability" that but for counsel's incompetence, the defendant would have been found innocent. (See *People v. Johnson* (1993), 154 Ill. 2d 227, 234 ("To demonstrate prejudice, a defendant must show a reasonable probability that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation]".) Since defendant points to nothing from which we may infer that the jury considered the inadmissible extrajudicial oral statements, he fails to persuade that his attorney's alleged incompetence deprived him of his right to a fair trial.

## B

Defendant next claims that counsel's erroneous failure to tender Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d) was prejudicial. The instruction provides:

> "When a witness says that he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be carefully considered by you with caution. It should be carefully examined in light of the other evidence in the case."

We have explained the rationale behind this instruction to be as follows:

> "Due to the relationship of the [accomplice] witness and the State, there may be a strong motivation to testify falsely for the accomplice who seeks, hopes or expects lenient treatment by the State in return for favorable testimony. [Citations.] Thus a witness, knowing that his own guilt is detected, may seek to shield himself from punishment by purchasing immunity or leniency by falsely accusing others and procuring their conviction. Even if a promise or expectation of leniency is denied, its existence is always suspected. [Citation.] Therefore a judicial in-

struction cautioning the jury that the testimony of an accomplice is subject to suspicion has been felt warranted." *People v. Riggs* (1977), 48 Ill. App. 3d 702, 705, 363 N.E.2d 137, 139.

The accomplice-witness instruction, IPI Criminal 2d No. 3.17, should be given where "there is probable cause to believe that [the witness] was guilty either as a principal, or on a theory of accountability." (*People v. Robinson* (1974), 59 Ill. 2d 184, 191, 319 N.E.2d 772, 776; see also *People v. Cobb* (1983), 97 Ill. 2d 465, 476, 455 N.E.2d 31, 35; *People v. Carreon* (1987), 162 Ill. App. 3d 990, 993, 516 N.E.2d 372, 374, *appeal denied* (1988), 118 Ill. 2d 547, 520 N.E.2d 388.) An individual may be indicted for an offense committed by another where there is probable cause to believe that: "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c).) We find the record before us with regard to Atkins' complicity in the murder of Rhodes insufficient to establish even a threshold as low as the "probable cause" standard.

■ Atkins had told police only that he had been robbed by an unknown perpetrator and that after reporting the robbery to his employers, he returned with them to the spot where it occurred, and it was there that the murder of Rhodes transpired which Atkins admittedly witnessed. But "[a]ccountability requires more than mere presence at the scene [of the underlying crime] or knowledge that a crime is being committed." (*People v. Batchelor* (1990), 202 Ill. App. 3d 316, 330-31, 559 N.E.2d 948, 958; see also *People v. Owen* (1975), 32 Ill. App. 3d 893, 337 N.E.2d 60 (holding that presence and persistence at the scene of a crime is not a sufficiently affirmative act to constitute aiding and/or abetting the commission of that criminality).) In order to indict, there must also be evidence from which a grand jury may infer that the potential indictee somehow aided in the commission of a crime and in so doing, he acted with the requisite *mens rea*, which we find absent in the record before us.

Atkins made no statements to police tending to show that he brought the Hoard brothers to the scene of the crime so that they would exact revenge on the individual who had robbed him, nor did he confess anything else which could reasonably be said to imply that he harbored the specific "intent to promote or facilitate" the perpetration of the homicide of Rhodes. Defendant compares the evidence here to that in *Carreon* (162 Ill. App. 3d 990, 516 N.E.2d 372), where we found error in the court's refusal to give the accomplice-witness instruction. However, defendant's reliance on that precedent is mis-

placed because, unlike the instant case, there was sufficient evidence to support a belief amounting to probable cause that the State's witness intended to facilitate the commission of a robbery-homicide. In *Carreon*, the witness confessed to being with the defendant before, during, and after the commission of the crime and was found with $260 which he admitted was part of the proceeds of the robbery. The *Carreon* court found that a sharing of the fruit of a crime manifested an initial intent to abet the commission of the crime. *Carreon*, 162 Ill. App. 3d 990, 516 N.E.2d 375; *cf. People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56 (sustaining a conviction for robbery and murder tried on a theory of accountability where the evidence showed that the defendant was present during the commission of the offense and received proceeds from the robbery).

Here, there is no evidence which even intimates that Atkins was bent on doing anything other than simply bringing his employers to the place where he was robbed. Since the element of Atkins' specific criminal intent to commit a criminal act is lacking, it would be exceedingly difficult to conclude that such action would amount to an indictable offense; accordingly, had counsel tendered the accomplice-witness instruction, the court would not have been obliged to charge the jury with it. Therefore, counsel's failure to tender the instruction does not fall below the threshold of professional competence, which is the first of *Strickland*'s two necessary prongs.

Moreover, even if we were to hold that the failure to tender IPI Criminal 2d No. 3.17 in this instance constituted an absence of legal ability sufficiently severe to be considered less than "reasonably effective assistance," this satisfies only the first prong of *Strickland*. Defendant offers nothing to convince us that due to his counsel's omission, he suffered actual prejudice. The fact that Atkins had related various and somewhat contradictory versions of the events of the evening was known to the jury. It also heard from defense counsel that the alternative stories raised doubts about the truth of any one of the statements. While a charge from the court informing the jury to view Atkins' testimony with caution would certainly magnify the doubts about his credibility, it cannot be seriously suggested that in the absence of such an instruction, the jury harbored no distrust concerning the veracity of Atkins' testimony.

We deem the case defendant cites in support of finding that this error constituted a grievous mistake by counsel, *People v. Butler* (1974), 23 Ill. App. 3d 108, 318 N.E.2d 680, to have no bearing here. In *Butler*, the court found that the defendant was denied a fair trial because of a multitude of attorney errors and omissions, only one of

which concerned the accomplice-witness instruction. In the court's words, "[t]he failure of defendant's appointed counsel to tender an instruction on accomplice testimony is but *one more serious indication of such counsel's lack of preparation or unfamiliarity with the criminal process.*" (Emphasis added.) (*Butler*, 23 Ill. App. 3d at 112, 318 N.E.2d at 683.) Here, counsel's error certainly does not warrant being met with such opprobrium. At worst it may be characterized as an oversight, but merely a harmless one which played no meaningful role in defendant's conviction.

## C

The final instruction matter which defendant maintains raises doubts about the accuracy of the jury's verdict concerns the affirmative defense of justification. He argues that the State's evidence, namely the defendant's post-arrest statement to the police, provided the "some evidence" called for in section 3—2(a) of the Criminal Code (Ill. Rev. Stat. 1991, ch. 38, par. 3—2(a)), to give rise to the affirmative defense of justified use of force in the the arrest of another. (Ill. Rev. Stat. 1991, ch. 38, par. 7—6.) Therefore, he urges that counsel, by not tendering an instruction which advised the jury of the defense, foreclosed the chance that it would have found his conduct to be legally justified. The State again responds that counsel opted not to give the instruction because of trial strategy since his theory of the case was based on a quasi-alibi witness who placed defendant cowering on the ground 40 feet from the victim at the time Crack and Sinbad shot him.

From our review of the record as a whole, we recognize that it is difficult to discern what defense counsel's theory was. His case consisted of the testimony of Traveres Williams, who stated that at the time of the incident, he and defendant prostrated themselves to avoid the hail of gunfire. This testimony may have been offered to refute the State's theory that defendant participated in the shooting. It does deny Atkins' rendition of the events on the evening of the shooting and contradicts defendant's own inculpatory statement that at the time of the shooting he was standing next to Crack and Sinbad and guarding against the man in the wheelchair. Counsel may have been trying to plant an alibi defense in the minds of the jurors, as the State contends, and if so, the decision not to tender the instruction on justification, which would be inconsistent with the defense theory, would truly be trial tactics, which will not generally support a claim of ineffective assistance. *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 770, 445 N.E.2d 1213, 1218 ("Generally, the decision to rely on

one theory of defense to the exclusion of others is a matter of trial tactics").

However, counsel also made certain statements which undermine the State's contention that he made a conscious choice to forego the possibility of a defense based on justified conduct. During the argument in support of defendant's motion for a directed verdict and in summation before the jury, counsel contended that an innocent construction should be placed on defendant's statement to the police which could be construed as submitting justification to the jury as a possible defense. He argued:

> "[Defendant] saw an armed—according to [his] statement, \*\*\*, he saw an armed robbery being committed in his presence. And though you may not agree and we may not agree with the use of guns on the street or handing one gun to another, the fact of the matter remains the evidence told you quite clearly there was an armed robbery going on in his presence. So does that mean if he approached toward the area perhaps with a weapon that that meant that he intended to commit a murder? Is that the only logical conclusion that a reasonable juror such as yourselves [sic] might draw in this case? Are there no other reasonable possibilities? Might it be that he wanted to stop something? Is that reasonably possible? Does the evidence convince you beyond a reasonable doubt of something else?"

The message of the argument seemed to be that defendant may have reasonably believed he needed to use deadly force. Consequently, we cannot conclusively determine that there was a conscious decision to abandon the justification defense; thus, we reject the State's assertion that the failure to tender an instruction on justification was indisputably due to trial strategy.

■ In *Strickland*, the Court noted that oftentimes ineffective assistance claims may be disposed of more readily because it is immediately apparent that defendant suffered no prejudice from the claimed errors. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) This is such a case, for we find that even had the circuit court apprised the jury that it could find defendant not guilty if it found his conduct justified, the record clearly shows that the defense would not only have provided no comfort, it would have been nothing short of spurious; therefore, his counsel's failure to tender the instruction had no impact on the outcome of his trial.

Under section 7—6 of the Criminal Code, an individual assisting a private person in the lawful arrest of another may use force likely to cause death or great bodily harm in that arrest "only when he reason-

ably believes that such force is necessary to prevent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1991, ch. 38, par. 7—6(a).) Here, it strains credulity to suggest that the jury, if instructed on the matter, would not have found beyond a reasonable doubt that defendant did not reasonably feel that deadly force was required to perfect the arrest of the perpetrator of the armed robbery of Atkins. Defendant offered no evidence from which the jury could ascertain his fear for himself or his gun-toting associates. In addition, by his own words, defendant provides the evidence which would affirmatively negate any evidence on the reasonableness of the fear. He stated that before he fired his weapon at the man in the wheelchair, who he feared was about to shoot him, someone turned the wheelchair around and began pushing its occupant, the threat defendant supposedly feared, away from the scene. Thus, defendant confessed that when he fired his weapon, he did so with the realization that the threat no longer existed.

The case defendant cites as authority for his position is clearly inappropriate. In *People v. Pegram* (1988), 124 Ill. 2d 166, 529 N.E.2d 506, the supreme court found counsel ineffective because he failed to tender an instruction on the affirmative defense of compulsion. In contrast with this case, *Pegram*'s counsel clearly premised his entire defense on compulsion: the defendant admitted committing the act of robbery but also testified in detail of how two men in ski masks ordered him to aid them in the armed robbery of a tavern, all the while threatening to "blow out his brains" if he did not strictly comply with their instructions. In short, his counsel presented a fair case of compulsion but overlooked the need to inform the jury that if it found the defendant was compelled, this would exonerate his otherwise culpable conduct. The court found that this omission was critical and that counsel's failure to tender the instruction on the defense was so professionally deficient that it denied defendant a fair trial.

In contrast, here, given the paucity of evidence to support the defense, and that defendant's statement, which allegedly gives rise to it, also unquestionably established that he knew there was no need for the use of deadly force, thus negating the defense with almost the same breath as the one that gave it life, the failure of counsel to tender an instruction on the defense did not render his performance constitutionally infirm.

After viewing all of the alleged errors on the part of counsel, we cannot say that his representation was so deficient that defendant was denied a fair trial. While defendant did not receive perfect representation, he did receive what the Constitution mandates. He was rep-

resented by an attorney who did his best and whose performance had no deleterious impact on the trial's outcome. Counsel's performance was certainly well above the floor of competence set by *Strickland* which must be breached before a new trial is in order.

## II

Defendant next claims that since evidence presented by the State gave rise to the affirmative defense of justification (Ill. Rev. Stat. 1991, ch. 38, par. 3—2(a) (" 'Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon")), a lack of justification became an element of the crime charged. (Ill. Rev. Stat. 1991, ch. 38, par. 3—2 ("If the issue involved in an affirmative defense *** is raised then the State must sustain the burden of proving defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense").) Citing Supreme Court Rule 451(c) (134 Ill. 2d R. 451(c)), he reasons that because it was an element of the offense, the trial court was obligated to instruct the jury, *sua sponte*, that it must find beyond a reasonable doubt that the State proved defendant was not justified in his use of deadly force, as well as finding that it established the other elements of the crime. He maintains that the failure of the court to instruct the jury on all the elements of the crime which the State must prove violated the essence of fundamental fairness and, therefore, as a matter of plain error, this court should reverse his conviction and remand for a new trial.

The first question this issue raises is whether, based on the record before us, defendant merits the instruction on justification at all. A defendant is entitled to instructions on any and all defenses which find some support in the record, even "where the evidence is 'slight.' " (*People v. Everette* (1990), 141 Ill. 2d 147, 156, 565 N.E.2d 1295, 1298; *People v. Lyda* (1989), 190 Ill. App. 3d 540, 546 N.E.2d 29.) The proof necessary is that quantum which is sufficient in and of itself to raise a reasonable doubt as to defendant's guilt. (*People v. Redmond* (1974), 59 Ill. 2d 328, 337-38, 320 N.E.2d 321, 326; *People v. Larry* (1986), 144 Ill. App. 3d 669, 676, 494 N.E.2d 1212, 1217.) When deciding whether the evidence presented at trial attains this level, the trial court may not refuse to charge the jury accordingly because it presents a defense which is inconsistent with the defendant's own testimony. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34; *People v. Izzo* (1958), 14 Ill. 2d 203, 211, 151 N.E.2d 329, 334-35.) In other words, unless there is clear and convincing evi-

dence in the record from which a court can conclude that as a matter of law the asserted affirmative defense is meritless, the court must give the tendered instruction on that defense and allow the jury to decide if the defendant should be exonerated for his otherwise culpable conduct. *Larry*, 144 Ill. App. 3d at 676, 494 N.E.2d at 1217.

In *People v. Lyda*, the court found that a trial court erred by refusing to give a tendered instruction on the justifiable use of force in the defense of others. The court held that the State had provided more than sufficient evidence to give rise to the defense, as the arresting officer admitted that in subduing defendant's brother, the officers "used increasingly more forceful measures to restrain [the brother]." (*Lyda*, 190 Ill. App. 3d at 545, 546 N.E.2d at 33.) Defendant's brother was restrained by a chokehold and was hog-tied with a rope "while several other officers held him facedown on the wet ground." (*Lyda*, 190 Ill. App. 3d at 545, 546 N.E.2d at 33.) The court found that the jury could reasonably conclude that defendant's assault on the police officer was based on his reasonable belief that he needed to protect his brother from what the jury could find to be police brutality.

During the defendant's case, he presented further support for his reasonable belief that his attack on the officer was necessary in order to prevent serious injury to his brother. An occurrence witness testified that defendant was not the aggressor, and that he initially tried to calm his brother, and that the brother was being brutalized unnecessarily. In short, although ample evidence supported the defendant's claim of justification, the trial court nonetheless refused the instruction when tendered.

■ Conversely, the only evidence in the instant case which tends to establish the defense of justification was a remark made by defendant in his statement to police that he went to the scene of the crime to "help out" Sinbad and Crack, and that he fired his weapon because he thought that the man in the wheelchair had a weapon and was about to shoot him and his confederates. Unlike the defendant in *Lyda*, defendant offered nothing during his presentation of evidence which furthered the alleged defense and, in fact, offered the testimony of Traveres Williams which was inconsistent with defendant's statement which supposedly gives rise to the defense. Viewing the record in its entirety, we find that the evidence of defendant's justification suffers pitifully in comparison to the quality and quantity of evidence offered in *Lyda*.

Moreover, defendant admitted in the same statement that before the man in the wheelchair drew his weapon and pointed it at him,

someone turned the chair around and pushed its occupant away from the scene. He conceded that before he fired, the threat which he now alleges justified his use of deadly force was removed immediately; therefore, the record demonstrates that before he fired his weapon, defendant understood that his use of that deadly force was no longer needed to protect himself or his friends. Accordingly, we hold that had defense counsel tendered an instruction on justified use of deadly force, the trial court could have reasonably refused his request as the instruction would not have been supported by the evidence. See *Larry*, 144 Ill. App. 3d at 676, 494 N.E.2d at 1219 (finding no error in the court's refusal to instruct the jury on the defense of intoxication where the evidence which purported to give rise to the defense affirmatively established its inapplicability as well, *i.e.*, that the defendant, although unaware that the white powder was phencyclidine or "angel dust," ingested the narcotic willingly).

The mere incantation of a word or phrase which, when viewed in isolation, may be construed to give rise to an affirmative defense does not satisfy the "some evidence" standard of section 3—2 of the Criminal Code. (Ill. Rev. Stat. 1991, ch. 38, par. 3—2.) There must be enough evidence so that, if believed, it would be "sufficient for a reasonable jury to find in his favor." (*Mathews v. United States* (1988), 485 U.S. 58, 63, 99 L. Ed. 2d 54, 61, 108 S. Ct. 883, 887.) As we have noted: " 'To hold otherwise would permit a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon *the merest factual reference* or witness comment.' " (Emphasis in original.) (*People v. Mitchell* (1987), 163 Ill. App. 3d 58, 67, 516 N.E.2d 500, 506, *appeal denied* (1988), 119 Ill. 2d 567, 522 N.E.2d 1252, quoting *Bratcher*, 63 Ill. 2d at 540-41, 349 N.E.2d at 34.) Here, all defendant relies upon is an equivocal and self-serving reference made in passing. It was not the substance of his defense and received no great notice by anyone at the trial level. In fact, not only would the jury have been unlikely to find in defendant's favor based on this defense, but given the singular lack of emphasis on the statement in defendant's case, it would be quite understandable if the jury, trial counsel and even the trial judge failed to appreciate that the statement could give rise to a defense which was not fully explicated until this appeal. More important, since the defendant himself admitted in his statement that the threat which gave rise to his asserted fear of grave bodily harm took flight before he fired a shot, no jury could have reasonably found that his use of great bodily force was justified. Therefore, defendant would not have been entitled to an instruction on justification had one been tendered and, as a conse-

quence, under Rule 451(c), in the absence of a tendered instruction, the court had no obligation to inform the jury of justification *sua sponte*.

Furthermore, assuming *arguendo* that the evidence here was sufficient to establish the affirmative defense, the court's failure to charge the jury with an instruction on justification would still not warrant reversal of his conviction. The general rule holds that a party waives any contentions with regard to instructions by not making a contemporaneous objection, and a party will not be heard to complain about the failure of the court to issue a particular instruction unless it was tendered at trial. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543, 440 N.E.2d 1248, 1251; 134 Ill. 2d R. 366(b)(2)(i) ("No party may raise on appeal the failure to give an instruction unless he shall have tendered it").) Supreme Court Rule 451(c) carves a thin exception to this precept to provide a plain error rule for instructions only where necessary to ensure the fundamental fairness of a trial. *People v. Ogunsola* (1981), 87 Ill. 2d 216, 222, 429 N.E.2d 861, 864.

Fundamental fairness mandates that the jury be apprised of certain elemental legal propositions, such as the correct elements of the crime charged and the presumption of the defendant's innocence. (*People v. Roberts* (1979), 75 Ill. 2d 1, 13, 387 N.E.2d 331, 336.) *Roberts* creates a twofold test for determining when the interests of justice dictate that a trial court errs in failing to give an instruction without the prompting of counsel. Defendant must show that the omission is a grave error and that the case is factually close. (*Roberts*, 75 Ill. 2d at 14, 387 N.E.2d at 337.) In other words, it must be apparent that the failure to instruct the jury properly stood a fair chance of affecting the outcome of the case. Surely that cannot be said here. As discussed *supra*, defendant did not base his defense on justification, nor can it be said that had the jury been instructed it would have been likely to find him innocent on that ground. In *People v. Alvarez* (1989), 186 Ill. App. 3d 541, 551, 542 N.E.2d 737, 745, *appeal denied* (1990), 129 Ill. 2d 565, 550 N.E.2d 559, we held that under *Roberts'* formulation of Rule 451(c), it is not enough for the record to suggest that one may have been entitled to an instruction; rather, it must affirmatively establish that the defendant actually was so entitled. Here, given the scant evidence which could even tend to show the defense of justification and the reed-thin chance that the defendant would actually be acquitted on the purported defenses, we decline to find error in the trial court's failure to instruct the jury *sua sponte* on whether defendant was justified in shooting the victim.

### III

Defendant's third allegation of error centers on a comment made by the trial court while passing sentence, which defendant contends indicates that the court based his 35-year term of incarceration on an impermissible ground. Our supreme court has held consistently that the imposition of sentence is within the trial court's discretion and that a sentence imposed will not be altered by a reviewing court unless the trial court abused its discretion. (See *People v. Ashford* (1988), 121 Ill. 2d 55, 88, 520 N.E.2d 332, 346; *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883; *People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330.) Moreover, a sentencing court's decision is cloaked with a presumption of correctness (*People v. Choate* (1979), 71 Ill. App. 3d 267, 275-76, 389 N.E.2d 670, 676), and we must be hesitant to reduce a sentence which is within the statutorily prescribed range. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

In *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, our supreme court held that a sentencing court abuses its otherwise substantial sentencing discretion when it considers in aggravation a fact which is implicit in the offense for which the defendant is being sentenced. It reasoned that the legislature contemplated those factors while setting the permissible range of penalties and that, therefore, were the court to include the act in its calculus of the appropriate sentence, the defendant would be twice punished for the same conduct. In *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, the court applied the rule of *Conover* to a sentence imposed on an individual convicted of voluntary manslaughter.

While passing sentence, the trial court in *Saldivar* expressly relied upon, to the exclusion of all other aggravating factors, the fact that the defendant took the life of another. *Saldivar* held that while a court sentencing an individual convicted for a homicide is free to base the extent of punishment on the force employed or the manner in which the victim's death occurred, it cannot accord any weight to the fact that the victim died. The supreme court modified the defendant's sentence to the statutory minimum because the circuit court, in passing sentence, primarily focused on the end result of the defendant's conduct, which the court found to be an impermissible ground.

In the case at bar, after listening to the State and defense present their aggravating and mitigating factors respectively, the trial court recited for the record what it deemed relevant to the extent of punishment to be meted out to defendant. It indicated that it considered

all the factors presented by defendant in mitigation including his lack of a prior criminal history, his youth, and his employment and educational experience. In aggravation the court attached significance to the evidence presented in the guilt phase of the case; that defendant was accountable for the actions of Crack and Sinbad; and that the court had an obligation to impose upon defendant a sentence which would deter him and others from committing crimes similar to his. The court also mentioned that it

> "[took] into consideration the fact that the Defendant's action along with the actions of others were actions that clearly caused a great loss. It caused the death of an individual, the victim in this particular case."

Defendant claims that this reference shows that the court violated the rule of *Saldivar*, and because his punishment is premised on an impermissible ground, the cause must be remanded for a new sentence. The State counters that the court did not consider the end result of the killing but only the manner and brutality of the killing, which *Saldivar* recognized as appropriate concerns of a court passing sentence on an individual convicted of a homicide. *Saldivar*, 113 Ill. 2d at 269, 497 N.E.2d at 1143 (holding that the extent of harm and manner of crime "may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*"). (Emphasis in original.)

The State's argument asks too much. The court did not make even the most cursory mention of the manner or brutality of the homicide. Instead, it touched only on the fact that defendant killed another human. Clearly, it expressly considered an impermissible factor in passing sentence. However, not every mention of an impermissible factor necessitates remandment for a new hearing. (*People v. White* (1986), 114 Ill. 2d 61, 499 N.E.2d 467.) As we have recognized: "it is unrealistic to suggest that the judge in sentencing the defendant must avoid mentioning the fact that someone had died or risk committing reversible error." (*People v. Green* (1991), 209 Ill. App. 3d 233, 248, 568 N.E.2d 92, 101-02, *appeal denied* (1991), 141 Ill. 2d 550, 580 N.E.2d 124.) The key inquiry is whether the court attached any meaningful significance to the impermissible factor while deciding the extent of the appropriate sentence. (*People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340; *People v. Watts* (1990), 195 Ill. App. 3d 899, 918, 552 N.E.2d 1048, 1060, *appeal denied* (1990), 133 Ill. 2d 570, 561 N.E.2d 705.) A sentence cannot be affirmed if we are unable

to ascertain from the record the weight given the improper factor. *People v. Martin* (1988), 119 Ill. 2d 453, 519 N.E.2d 884.

■ The trial judge in the case at bar made only passing reference to the fact that it considered the victim's death in aggravation. It stressed the need to impose a sentence which would deter not only defendant but also other individuals, so unlike *Saldivar*, where the court focused on the death of the victim to the exclusion of the other factors in aggravation, this sentencing judge patently did not unduly ascribe substantial weight to the incompetent factor. Most important, defendant was convicted of first-degree murder, which is punishable by a term of imprisonment of not less than 20 years nor more than 60 years (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1)); thus, his term of 35 years was well within the permissible range of punishment. The record reflects that the trial court's consideration of the end result of defendant's culpable conduct was negligible; therefore, we deny defendant's request to remand this action for resentencing.

## IV

As a final matter, defendant was indicted for two counts of first-degree murder, but only one individual actually was slain. In *People v. Mack* (1984), 105 Ill. 2d 103, 136-37, 473 N.E.2d 880, 898, our supreme court held that an individual can be sentenced for only one count of murder where one person dies. "When multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense." *Mack*, 105 Ill. 2d at 137, 473 N.E.2d at 898.

■ Both parties agree that the mittimus must be amended to vacate defendant's conviction for the second count of murder. We therefore invoke our authority under Supreme Court Rule 366(a)(3) (134 Ill. 2d R. 366(a)(3)) to correct the trial court's oversight, and alter its sentencing order to reflect a single conviction for murder.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.